DR. TAMIERA HARRIS
4821 Unruh Avenue
Philadelphia, Pennsylvania 19135
215-987-6860
tamieraharris@gmail.com
Plaintiff in Pro Per

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMIERA HARRIS, AN INDIVIDUAL; T.H., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM,<br><br>Plaintiff(s)<br><br>vs.<br><br>CITY OF PHILADELPHIA, PHILADELPHIA POLICE DEPARTMENT; DEPARTMENT OF HUMAN SERVICES; NET COMMUNITY CARE; CYNTHIA FIGUEROA; MIRIAM COLON; KENNETH DIXON; CHARISE GALE; TIFFANY VANN; CATERINA GALLELLI; SHARON CONAWAY; CRAIG MARTELLA; AND DOES 1 THROUGH 50, INCLUSIVE,<br><br>Defendant(s) | Case No.: 19    5436<br><br>COMPLAINT FOR DAMAGES<br>CLAIM 1: VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983 (UNWARRANTED SEIZURE)<br>CLAIM 2: 42 U.S.C. §1983 (JUDICIAL DECEPTION)<br>CLAIM 3: MONELL-RELATED CLAIMS<br>CLAIM 4: VIOLATION OF STATE CIVIL RIGHTS<br>CLAIM 5: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>CLAIM 6: NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS<br>CLAIM 7: FALSE IMPRISONMENT<br>CLAIM 8: ASSAULT<br>CLAIM 9: BATTERY<br>CLAIM 10: ABUSE OF PROCESS<br>CLAIM 11: INVASION OF PRIVACY<br>CLAIM 12: DECLARATORY RELIEF<br>**[JURY TRIAL DEMANDED]**<br><br>Dated this 17ⁿᵈ day of October 2019<br><br><br>TAMIERA HARRIS<br>Plaintiff in Pro Per |

Plaintiffs, TAMIERA HARRIS ("Tamiera Harris" or "Harris") and T.H., by and through her guardian ad litem, respectfully represent and allege as follows:

## JURISDICTION

1. Tamiera Harris and T.H. bring this civil rights lawsuit pursuant to 42 U.S.C. section 1983 to redress the deprivation by Defendants, at all times herein acting under color of state law, of rights secured to Plaintiffs under the United States Constitution, including the First, Fourth, and Fourteenth Amendments, and under federal and state law.

2. Jurisdiction is conferred on this Court by 28 U.S.C. sections 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. section 1983. Jurisdiction is also conferred by 28 U.S.C. section 1331 because claims for relief derive from the United States Constitution and the laws of the United States. This Court has supplemental jurisdiction over those claims of Plaintiffs based on state laws, pursuant to 28 U.S.C. section 1367.

## PARTIES

3. At all times relevant to this Complaint, Plaintiffs were residents of City of Philadelphia, Pennsylvania. Plaintiff TAMIERA HARRIS is the Pre adoptive parent of minor Plaintiff, T.H. (a fictitious name is used herein to protect the minor's privacy). At the time the incidents giving rise to the causes of action in this Complaint occurred, T.H. was two and a half (2.5) years old.

4. At all times applicable herein, the CITY OF PHILADELPHIA was and is a public entity ("County" or "City of Philadelphia").

5. At all times applicable herein, the DEPARTMENT OF HUMAN SERVICES ("DHS") was and is a subdivision, entity, or administrative arm of the CITY OF PHILADELPHIA.

6. At all times applicable herein, the NET COMMUNITY CARE ("NET CUA") was and is a subdivision, entity, or administrative arm of DHS and/or the CITY OF PHILADELPHIA.

7. At all times applicable herein, the Philadelphia Police Department ("PPD") was and is a subdivision, entity, or administrative arm of the CITY OF PHILADELPHIA.

8. At all times applicable herein, Commissioner Cynthia Figueroa ("Cynthia Figueroa" or "Figueroa") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, and/or employee of County and DHS. Defendant Figueroa is sued herein in her official capacity as an employee of the City of Philadelphia and DHS.

9. At all times applicable herein, social worker Kenneth Dixon ("Kenneth Dixon" or "Dixon") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, and/or employee of County and DHS. Defendant Dixon is sued herein in her individual capacity as an employee of the City of Philadelphia and DHS.

10. At all times applicable herein, social worker Miriam Colon ("Miriam Colon" or "Colon") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, and/or employee of County and NET CUA. Defendant Colon is sued herein in her individual capacity as an employee of the City of Philadelphia and/or NET CUA.

11. At all times applicable herein, social worker Charise Gale ("Charise Gale" or "Gale") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, employee of County and/or NET CUA Defendant Gale is sued herein in her individual capacity as an employee of the City of Philadelphia and/or NET CUA.

12. At all times applicable herein, social worker Tiffany Vann ("Tiffany Vann" or "Vann") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent,

employee of County and/or NET CUA. Defendant Vann is sued herein in her individual capacity as an employee of the City of Philadelphia and/or NET CUA.

13. At all times applicable herein, social worker Caterina Gallelli ("Caterina Gallelli" or "Gallelli") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, employee of County and/or NET CUA. Defendant Gallelli is sued herein in her individual capacity as an employee of the City of Philadelphia and/or NET CUA.

14. At all times applicable herein, Police Officer Sharon Conaway ("Sharon Conaway" or "Conaway") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, employee of County and/or PPD. Defendant Conaway is sued herein in her individual capacity as an employee of the City of Philadelphia and/or PPD.

15. At all times applicable herein, Police Officer Craig Martella ("Craig Martella" or "Martella") was an individual residing on information and belief, in the City of Philadelphia, and an officer, agent, employee of County and/or PPD. Defendant Martella is sued herein in her individual capacity as an employee of County and/or PPD.

16. Hereinafter, when referred to collectively, the Defendants in paragraphs 9 through 13, inclusive, will be referred to as SOCIAL WORKER DEFENDANTS and Defendants in Paragraph 14 through 15 Police Defendants.

17. Defendants DOES 1 through 50 are sued as fictitious names, their true names and capacities being unknown to Plaintiff. When ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiff's damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names. On information and belief, Plaintiff makes all allegations contained in this Complaint against all Defendants, including DOES 1 through 50.

18. Whenever in this Complaint reference is made to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1 through 50, or their officers, agents, managers, supervisors, representatives, employees, heirs, assignees, customers, tenants, did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

19. At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiff is informed and believes that each Defendant (including DOES 1 through 50), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, manager, supervisor, controlling franchiser, controlling licensor, principal, and/or joint venture of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

## COMMON ALLEGATIONS

20. DHS AND Net CUA social services agent jointly collaborated with the Police Defendants by agreeing to and/or concurring with the decision to seize T.H. and transport her to a non-family related foster care facility under the ownership, management, stewardship and/or control of the City

of Philadelphia. None of the Defendants bothered to contact T.H.'s back up legal guardian or any biological family of T.H. for almost 2 years.

21. Social services Defendants with the collaboration of Philadelphia police officers, snatched T.H. from the care and custody of Tamiera Harris, without notice or parental consent, in the absence of exigent circumstances, and without judicial authorization. Said seizure was unlawful and in violation of Plaintiffs' Due Process rights, familial association rights, liberty interests, and familial privacy rights, arising under and guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution, among others.

22. Plaintiffs are informed and believe and thereon allege that at the time of seizure the Social workers defendants knew, or had reason to know, the allegations and safety complaint were false as they were never seen on the videotaped removal investigating the safety complaint allegations nor did they disclose any exigent circumstances that would require the child T.H. to be removed from her home without Judicial Authorization.

23. The City of Philadelphia, DHS and NET CUA were in possession of no specific, articulable evidence giving rise to a reasonable suspicion that T.H. had been abused or neglected by Tamiera Harris, or that T.H. was in imminent danger of abuse or neglect by Tamiera Harris.

24. Moreover, testimony from SOCIAL WORKER DEFENDANTS on March 22, 2018, attested to under penalty of perjury, contained false statements of fact which were, on information and belief, known by the SOCIAL WORKER DEFENDANTS to be false at the time they made them. DHS and NET CUA Defendants retaliated in spite with evil and malice after plaintiff Tamiera Harris filed grievances against the agencies for performance issues and delays with the adoption.

25. The City of Philadelphia, DHS and NET CUA and the court was on notice since July of 2018 that the safety complaint made against the Plaintiff Tamiera Harris was unfounded. SOCIAL WORKER DEFENDANTS under duress required the maternal grandmother to sign a safety plan in December of 2018 which stated that the child could not be left alone with Tamiera Harris even though there has never been any finding of abuse or neglect. Despite the lack of any evidence that T.H. had suffered any abuse, or that Tamiera Harris represented any danger to T.H., whatsoever, the County continued to detain T.H for almost two years.

26. The City of Philadelphia, DHS and NET CUA failed to place T.H. with her back up guardian who was designated by NET Community Care in a notarized agreement on October 2016 as the rightful guardian of T.H. if the Plaintiff became incapacitated. The City of Philadelphia, DHS and NET CUA failed to contact any of the child's T.H. biological family for placement although multiple biological family members filed legal custody petitions.

27. DHS and NET Community care admitted to making a removal decision prior to investigating the safety allegation per Social worker Defendant Colon and Dixon who testified on March 22, 2018 that there was a discussion with their Supervisors on December 21, 2017 that the child was to be removed based on the safety allegation on December 11, 2017 that there was not a car seat inside the home and no baby food for the 2.5 year old

28. In a video and audio tape of the seizure, the SOCIAL WORKER DEFENDANTS failed to disclose the safety allegations on why the child was being removed without Judicial Authorization and Plaintiff Tamiera Harris affirmed that she was awarded Physical Custody of the child and was the pre adoptive parent. The Plaintiff confirmed that she did not agree with the removal and she would file a lawsuit if they seized T.H. without a court order or warrant.

29. Despite witnessing these abhorrent, repugnant, and unlawful actions, the police officers on scene, who could have stopped the SOCIAL WORKER DEFENDANTS failed to intervene and supported the illegal seizure by snatching the child T.H. from Plaintiff Tamiera Harris's hands. Their failure to

intercede and/or prevent the continuing deprivation of Constitutional rights was inexcusable, unjustified, and in gross dereliction of their sworn duties as police officers.

30. The child T.H. subsequently suffered head and face injuries in her 1st non family foster care placement under DHS and NET CUA watch. She was then removed from that home and placed with a foster care family who neglected her and left her soiled which caused her injuries to her vagina that left her raw, pink and she was not treated medically under DHS and NET CUA watch. The child reported this injury in a Supervised visit to her Preadoptive Parent and the Plaintiff Tamiera Harris showed the NET CUA worker and filed a grievance on the child T.H. behalf. The child T.H. was placed in two additional non family foster care under DHS and Net CUA watch with a mentally disturbed child and suffered additional injuries, assault, fights and trauma.

31. The Plaintiff Tamiera Harris filed multiple grievances against DHS for their failure to return the child timely and for the injuries she sustained under their watch whereas with the Pre Adoptive Parent Tamiera Harris the child has never had any injuries and was up to date medically and on track educationally under Tamiera Harris care and custody. DHS requested a court order Psych evaluation of Plaintiff Tamiera Harris and failed to submit evidence to the court regarding the psychologist's recommendation that she felt the Plaintiff Tamiera Harris was fit and best suited to adopt the child.

32. As the direct and proximate result of the County's social services agents negligent conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

**CLAIM 1: RELIEF FOR VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983) (FAMILIAL ASSOCIATION, PRIVACY, UNWARRANTED SEIZURE AND WARRANTLESS SEIZURE; BY ALL PLAINTIFFS AGAINST SOCIAL WORKER DEFENDANTS; POLICE DEFENDANTS CONAWAY, MARTELLA, FIGERUOA IN HER OFFICIAL CAPACITY AND DOES 1 THROUGH 50, INCLUSIVE)**

33. Plaintiffs reallege, and incorporate herein as if set forth in full, all the preceding paragraphs. Plaintiffs, Tamiera Harris and T.H., are individuals and citizens of the United States, protected by 42 U.S.C. § 1983.

34. At all times relevant herein, the right to familial association guaranteed under the First, Fourth, and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable social services agent would know that it is unlawful to seize a child from the care, custody, and control of her parents without judicial authorization or exigency circumstances.

35. All defendants knew or should have known that Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment, include without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

36. Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 were acting under color of state law when they jointly acted, and/or agreed to violate T.H.'s constitutional rights by, but not limited to, seizing, removing, and/or detaining T.H. from her Pre Adoptive Parent's care, custody, and/or control.

37. Prior to T.H.'s unwarranted seizure, Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 each of them, discussed the proposed warrantless seizure. They all agreed and/or approved of the

decision to forgo obtaining judicial authorization prior to seizing T.H. from Tamiera's care, custody, and/or control.

38. Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, and each of them together, were joint and/or integral participants in T.H.'s seizure from Tamiera's care, custody, and/or control. These Defendants failed to intervene and stop T.H.'s seizure.

39. At that time of seizure, T.H. was residing in an Apartment with her Pre Adoptive Parent Tamiera Harris whom was awarded Physical custody of the child. T.H. was healthy, up to date on her immunizations, recently had a physical and had no signs of visible injuries, marks, bruises, malnutrition, neglect or abuse.

40. Prior to the seizure, Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, and each of them, failed to conduct a reasonable investigation which included discussing safety concerns with Tamiera Harris or making any reasonable efforts to prevent the removal.

41. Plaintiffs are informed and believe and thereon allege that the right to familial association guaranteed under, without limitation, the First, Fourth, and Fourteenth Amendments is "clearly established" such that a reasonable social services agent in Defendants' situation would know it is unlawful to remove a child from their home absent of exigent circumstances, without first obtaining judicial authorization.

42. Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment, to include without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

43. On or about December 22, 2017, Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 was acting under color of state law when they acted to violate Plaintiffs' civil rights by, but not limited to, seizing T.H. from the custody of her maternal cousin and Preadoptive Parent Tamiera Harris without a warrant or court order signed by a Judge. This seizure from the Plaintiffs home was done without the Plaintiffs or Judicial consent thereby violating Plaintiffs' rights under the First and Fourteenth Amendment of the United States Constitution. Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 did so without a court order or warrant, parental consent, and in the absence of exigent circumstances.

44. Plaintiffs are informed and believe and thereon allege that all defendants, knew, agreed with, and supported the December 22, 2017 conduct of Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, and thereby collaborated, acted, and conspired to violate Plaintiffs' civil rights.

45. None of the Defendants obtained nor sought a protective custody warrant prior to seizing T.H., nor did any of the Defendants seek or obtain Plaintiff Tamiera Harris's consent to remove T.H. Further, none of the Defendants possessed specific, articulable evidence to suggest that T.H. was in danger of sustaining serious bodily injury or death within the time it would have taken to obtain a protective custody warrant. Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, purposefully failed to seek/obtain a warrant and/or judicial authorization, knowing that insufficient grounds or evidence existed to support such application because of an unconstitutional policy, custom, or practice of failing to obtain warrants and/or Judicial removal orders prior to seizing children. Reasonable and less intrusive alternative means existed to secure both Plaintiffs' civil rights and T.H.'s security, without seizing T.H.'s yet Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 failed to pursue or even investigate such less intrusive alternative means.

46. As mentioned above, the Police Defendants Conaway and Martella intentionally acted, or knew and agreed and thereby conspired, to threaten harmful contact to Plaintiff, T.H., including, without

limitation, by threatening to seize T.H.'s person and sever her from the care and custody of her maternal cousin and Pre Adoptive Parent Tamiera Harris, without a warrant, and in the absence of exigent circumstances, and by snatching T.H. out of Plaintiff Tamiera Harris's hands in which Plaintiff T.H. did not consent to such conduct.

47. As a direct and proximate result of the threatening conduct of the Police Defendants, as mentioned above, coupled with their present ability to carry out the threat, Plaintiff T.H. reasonably felt the imminent apprehension of such contact, and therefore suffered severe emotional distress and other serious injuries to her person, in an amount to be shown according to proof.

48. T.H. is informed and believes that the aforesaid acts were carried out with the base and vile motivation of seizing and collaborating in the abduction of T.H., before her maternal cousin and Pre Adoptive Parent, Tamiera Harris, could contest their illegal plan in front of a Judge. Said acts were done with a conscious disregard of Plaintiff T.H.'s right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud or malice pursuant to Pennsylvania Title 42 § 8550, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of all Social Worker and Police Defendants.

49. Punitive damages, also referred to as "exemplary," "vindictive," "punitory," "smart money," and "presumptive" damages, "are sums awarded apart from any compensatory or nominal damages, usually as punishment or deterrent levied because of particularly aggravated misconduct on the part of the defendant." D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.9, at 204 (1973) where the defendant has committed a malicious, wanton, or intentional tort, or a reckless offense in disregard of the rights or safety or others. See Roberts v. Pierce, 398 F.2d 954 (5th Cir. 1968); Morgan v. Bates, 390 P.2d 486 (Okla. 1964); RESTATEMENT OF TORTS § 908 (1939).

50. T.H. is informed and believes that the aforesaid acts were carried out with the base and vile motivation of inflicting serious emotional harm to T.H. and to her Pre Adoptive Parent, Tamiera Harris, to exact revenge for Tamiera Harris filing grievances against DHS and CUA for performance issues and delays with the adoption.

51. Said conduct constitutes a substantive violation of Plaintiffs' rights guaranteed by the First, and Fourteenth Amendments to the United States Constitution. By unlawfully seizing and removing T.H. from Plaintiff Tamiera Harris care, or conspiring to do the same, without first providing adequate notice or an opportunity to be heard, these Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, also violated Plaintiffs' procedural due process rights.

52. Defendants committed these unconstitutional acts without proper justification or authority, and without probable cause, exigency, or court order.

53. Defendants, and each of them, maliciously violated, recklessly violated, and/or conspired to violate the civil rights of Plaintiffs, including violation of Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution by, but not limited to, removing, detaining, and continuing to detain the minor, T.H., from the care, custody, and control of her Pre Adoptive Parent for almost 2 years, without proper or just cause and/or authority, and by use of coercion, duress, perjury or fraud. Said acts were taken deliberately, with callous or reckless indifference to the substantial rights of Plaintiffs or fueled by an evil motive or intent to avoid accountability for errors by DHS, PPD, NET CUA and indifference for abiding by child welfare laws in the State of Pennsylvania and City of Philadelphia.

54. Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, acted with malice and with the intent to cause injury to Plaintiff, or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner. Plaintiffs are therefore entitled to recover punitive damages from the individual Defendants Colon, Dixon, Conaway, Martella and DOES 1-50, and

each of them, as permitted by law and as according to proof at trial, due to the wrongful conduct of defendants, as herein alleged, and to deter them and others from such conduct in the future.

55. The SOCIAL WORKER DEFENDANTS and Police Defendants removed T.H. from the family home without judicial authorization, without parental consent, and in the absence of exigent circumstances; failing to discharge their duty to consider whether T.H. could remain safely in her residence with her Pre Adoptive Parent, prior to removal; and continuing to detain T.H. after any purported reason for doing so had been extinguished.

56. The Plaintiff notified all SOCIAL WORKER DEFENDANTS and Defendant Figueroa in her official capacity that the allegations were fabricated based on pictured, video and email evidence included in the court record that confirmed there was a travel agreement between the Plaintiff, DHS and CUA which was confirmed via email and included in court records, the child had a car seat and was pictured in her car seat inside of Plaintiffs Tamiera Harris Vehicle. The plaintiff submitted original receipts of all of child's T.H. furniture purchases, included a car seat, crib and toddler bed, there were pictures of the Plaintiffs refrigerator two days prior to the removal which confirmed there was food for the child, and the confirmation of video screenshots that there was audio and video evidence of a positive and safe home visit which confirmed that the SOCIAL WORKER DEFENDANTS committed perjury, fraudulently used state funds to continue the seizure of the child and Judicially deceived the court for almost 2 years in order to prolong the seizure of T.H. Each act mentioned above was carried out intentionally, and with full knowledge of the probable consequences thereof.

57. As a direct and proximate result of all Defendants' misconduct and lack of oversight, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those authorized by 42 U.S.C. section 1988, to an extent and in an amount subject to proof at trial.

58. Said acts were done with a conscious disregard of Plaintiffs right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud, malice, assault and harassment pursuant to Pennsylvania Code Title 42 § 8550, Pennsylvania Code Title 18 § 2709 entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of SOCIAL WORKER DEFENDANTS; Police Defendants Conaway, Martella and DOES 1 through 50, Inclusive.

59. City of Philadelphia is vicariously responsible for the conduct of its Social Worker and Police Defendants, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

**CLAIM 2: (42 U.S.C. §1983 VIOLATION OF PLAINTIFFS' DUE PROCESS RIGHT TO BE FREE FROM DISHONESTY OF PUBLIC EMPLOYEES IN JUVENILE COURT PROCEEDINGS, I.E. PERJURY, JUDICIAL DECEPTION, FABRICATION OF EVIDENCE, AND SUPPRESSION OF EXCULPATORY EVIDENCE; BY ALL PLAINTIFFS AGAINST SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE)**

60. Plaintiffs reallege, and incorporate herein as if set forth in full, Plaintiffs reallege, and in each of the foregoing paragraphs inclusive.

61. Plaintiffs are informed and believe and thereon allege that, at all times relevant herein, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the government, such that a reasonable social services agent in Defendants' situation would know it is unlawful to lie, fabricate evidence, and/or suppress

material exculpatory evidence in court reports or any other document filed with the juvenile court to influence judicial decision making.

62. In fact, Defendants, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to a sovereign Court with power to adjudicate substantial rights, including parental rights, and to refrain from using improper and deceptive means to obtain judicial sustention of recommendations seeking to disparage Plaintiffs' liberty interests. The Plaintiff had a positive record for over 2 years of social workers visiting the home and all visits were confirmed safe. The Plaintiff was also always flexible to social workers schedule even though texts show social workers would cancel or arrive late for visits.

63. In doing the things alleged hereinabove, Defendants, and each of them, were acting under color of state law when they acted, or knew and agreed and thereby conspired, to knowingly present false allegations, false or coerced testimony, fabricated evidence, and/or suppress exculpatory evidence, before the Juvenile Court, thereby violating Plaintiffs' rights found in the First and Fourteenth Amendment to the United States Constitution and breaching their duty to Plaintiffs.

64. As a direct and proximate result of these Defendants' violations, and in accordance with 42 U.S.C. § 1983, Plaintiffs' civil rights have been violated in that Plaintiffs have suffered, and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

65. The wrongful and despicable conduct of SOCIAL WORKER DEFENDANTS, and each of them, as herein alleged was intentional, done with malice, oppression, or fraud, with a callous or reckless indifference to the rights of Plaintiffs, or motivated by an evil intent, such that Plaintiffs are entitled to recover punitive damages in accordance with law and subject to proof at trial.

**CLAIM 3: RELIEF FOR MONELL RELATED CLAIMS FOR UNWARRANTED SEIZURE BY SOCIAL WORKER AND POLICE OFFICERS DEFENDANTS (BY ALL PLAINTIFFS AGAINST DEFENDANT CITY OF PHILADELPHIA, CYNTHIA FIGUEROA IN HER OFFICIAL CAPACITY AND DOES 1-50 INCLUSIVE)**

66. Plaintiffs reallege, and to the extent applicable, incorporate herein as if set forth in full, each of the foregoing paragraphs. Defendant City of Philadelphia including through its DHS entity, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to Monell liability. Monell v. Dept. of Social Services (1978) 436 U.S.

67. As stated herein, Defendants City of Philadelphia, Cynthia Figueroa and DOES 1 through 50, inclusive, have wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs, and with utter disregard of City's duties and obligations to Plaintiffs, acted, practiced and/or adopted policies, practices, procedures and/or customs which are in violation of the rights of Plaintiffs, including those to be free from governmental interference as to their familial associations and from unreasonable searches or seizures, including those relating to child abuse allegations and related actions and proceedings.

68. The City of Philadelphia and defendant Cynthia Figueroa has failed to acknowledge their improper, unlawful and unconstitutional actions, conduct and policies at the time of the incidents at issue in the present action, and Plaintiffs are informed and believe, and on that basis allege, that presently the City of Philadelphia has not changed or modified such actions, conduct and/or policies to conform to law. Figueroa received evidence via email safety complaint was fabricated and failed to intervene.

69. In addition, so long as T.H., remains a minor, and in the custody and care of her family, all the acts mentioned herein are repeatable.

70. The City's wrongful and unlawful conduct, actions and/or policies, unless and until enjoined and restrained by order of this court, will cause, and continue to cause, great and irreparable injury to Plaintiffs, and other individuals and citizens, in that City of Philadelphia will continue to act in accordance with said unlawful policies, and with deliberate indifference to their duties and obligations under state and federal law, including those under the Fourth and Fourteenth amendments as alleged hereinabove.

71. Plaintiffs have no adequate remedy at law to prevent or prohibit City of Philadelphia from continuing, and/or repeating, its unlawful and unconstitutional, conduct and policies other than through injunctive relief, and therefore seeks an order enjoining and prohibiting City of Philadelphia from, but not limited to, the following: a. the policy of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent; b. the policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists; c. the policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated; and d. the policy of pointing firearms on all occupants of a home during the execution of search and seizure warrants, including young children, without probable cause for believing such children represent any danger.

72. The County had a duty to implement and follow policies, customs, and/or practices (hereinafter referred to as "customs") which confirm and provide the protections guaranteed under the United States Constitution. The City of Philadelphia and defendant Cynthia Figueroa had a duty to use reasonable care to train, supervise, and/or control its agents, to protect these constitutional rights.

73. Based on the duties charged to its social workers, including the powers to seize children from their parents' custody, the City of Philadelphia knew or should have known of the need to establish customs required to protect the civil rights of parents and children with whom their agents regularly came into contact – and to adequately train its social workers.

74. At the time of the underlying events, the City of Philadelphia, DHS and/or NET CUA customs relating to the removal of a child from its parent's custody included, but were not limited to: a. The custom of removing children from their parent's custody without consent, court order, and in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury). b. The custom of removing children from their parent's custody without first performing a reasonable investigation. c. The custom of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

75. When Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 seized T.H. from Tamiera Harris's custody, they were acting pursuant to and in accordance with the City of Philadelphia through its entity DHS child removal customs. T.H.'s seizure had DHS supervisor approval.

76. T.H.'s warrantless seizure was not an isolated incident. Instead, the City of Philadelphia, DHS and/or NET CUA social workers regularly seize children from their parent's custody without consent, court order, and/or exigency as a custom practice. These unlawful seizures have resulted in several lawsuits against multiple offending social workers (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). The County never disciplined its social workers who seized T.H. from her Pre Adoptive Parent custody without consent, court order, and/or in the absence of exigency.

77. Philadelphia has the highest child separation rate in the country and minorities have been disproportionately targeted due to the City of Philadelphia use of stigmatized racism presenting scenarios of lack to remove children. The City of Philadelphia history of unwarranted removals have

caused a special committee to form in Philadelphia to investigate DHS practices and to provide recommendations to ensure compliance with State Child Protective Services Laws in Pennsylvania to protect children and due process rights of families and to prevent the unnecessary break-up of families (Resolution No 190779 Introduced October 3, 2019 by Councilmember Oh and Bass and passed October 10, 2019)

78. The City of Philadelphia or its entities DHS, PPD or NET CUA did not investigate or discipline Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 for seizing T.H. from her Maternal cousin and Preadoptive Parent's Tamiera Harris custody without consent, court order, and/or in the absence of exigency. The City of Philadelphia, PPD, DHS and/or NET CUA did not investigate or discipline Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 for failing to stop T.H.'s unwarranted removal. The City of Philadelphia continued to litigate and contest a child's adoption even after receiving audio and video evidence that the safety complaint was fabricated by the Social Worker Defendants.

79. The City of Philadelphia or its entities PPD, DHS, and/or NET CUA has refused to admit that its social workers or agents commit a constitutional violation when they seize a child from his or her guardian without consent, court order, and in the absence of exigency – and continues to do so. The County, PPD, DHS, and/or NET CUA denies that Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 violated T.H.'s rights when she was seized without consent, court order, and/or exigency. The County, PPD, DHS and/or NET CUA ratified and/or approved of Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 warrantless seizure of T.H.

80. The City of Philadelphia or its entities PPD, DHS, and/or NET CUA failed to train its social workers and agents on the constitutional rights of a guardian/pre adoptive parent and child, including but not limited to: a. The circumstances under which a court order must be obtained prior to removing a child from the custody of its parent or guardian(s). b. The fact that a court order or parental consent must be obtained prior to removing a child from the custody of its parent(s), when there was no exigency. c. That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence" that a child is in imminent danger of suffering serious bodily injury. d. That a social worker cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed. e. That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

81. The City of Philadelphia through its entities or agents, PPD, DHS, and/or NET CUA failure to train its agents on these established constitutional rights was a substantial factor in causing T.H.'s harm. Without adequate training, Defendants Colon, Dixon, Conaway, Martella and DOES 1-50 was unfamiliar with and oblivious to T.H.'s rights, when she was seized – without consent, court order, or exigency.

82. The City of Philadelphia through its entities or agents, PPD, DHS, and/or NET CUA knew or should have known that a parent and child cannot be separated without consent, court order, and/or exigency. But, the County, PPD, DHS, and/or NET CUA knowingly refrained from (1) revising and/or implementing child removal customs, and (2) training it social workers and agents that a child cannot be removed without consent, court order, and/or exigency. In addition, the County, PPD, DHS, and/or NET CUA refused to investigate or discipline its social workers and agents for removing a child without consent, court order, and/or exigency.

83. These actions, and/or inactions, of The City of Philadelphia through its entities or agents PPD, DHS, and/or NET CUA were the moving force behind the Plaintiff's injuries, as alleged herein; and as a result, Plaintiff has sustained general and special damages, in an amount to be proven at trial.

84. Defendants, and each of them, acted under color of state law when committing the acts alleged herein, in violation of Plaintiffs' rights.

85. Defendant City of Philadelphia, including through its entity DHS, and those Defendants sued in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs Tamiera Harris and T.H. at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "policy" or "policies") which confirm and provide the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments, to include without limitation, the protection of the right to familial relations; the right to privacy; the right not to be defamed or stigmatized; the right to be free of governmental deception, trickery, fabrication of evidence, and suppression of exculpatory evidence in juvenile dependency proceedings; and the right to procedural due process. Said defendants also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within DHS, to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs to avoid causing the injuries and damages alleged herein.

86. Plaintiffs are informed and believe and thereon allege that as the Commissioner of DHS, Cynthia Figueroa, was at all times relevant herein, possessed of final policymaking authority in that she was delegated by the City of Philadelphia of such power and responsibility including but not limited to the responsibility to set policies and priorities for DHS and the supervision and management of staff performing all child welfare services including the performance of its contractors like NET CUA.

87. Based on the duties charged to the City of Philadelphia, including the nature of its work relating to juvenile dependency proceedings, the City of Philadelphia and Cynthia Figueroa knew or should have known of the obvious need to establish customs, policies, and practices required to protect the civil rights of parents and their children.

88. Defendant City of Philadelphia, including through its entity DHS, established and/or followed policies, procedures, customs, and/or practices which policies were the moving force behind the violations of Plaintiffs' constitutional rights, including those under the Fourth and Fourteenth Amendments, by, but not limited to: a. the policy of detaining and/or removing children from their family/guardian and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent; b. the policy of removing children from their family/guardian and their homes without first obtaining a warrant when no exigency exists; c. the policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated; d. the policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with parental/guardian rights, including those as to familial relations; e. by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings; f. the practice of setting forth allegations in Juvenile Dependency Petitions against parents/guardians claiming safety issues regardless of whether specific, articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury; g. the policy, practice, or custom of making knowingly false allegations of child abuse, neglect, or using stigmatized racism in Juvenile Dependency Petitions signed under penalty of perjury as a means of intimidating parents, by coercion, into accepting lesser

charges, whether true or not and whether justified by extant evidence or not, thereby enabling the City of Philadelphia to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to funding by the State and Federal governments; and h. the custom, policy, and/or practice of fraudulently seizing children and charging parents or guardians with neglect or child abuse where none exists and when no findings have been substantiated.

89. The City of Philadelphia, including by and through its entity DHS and its policymaking officials like Defendant Cynthia Figueroa, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; and by deliberately permitting the SOCIAL WORKER DEFENDANTS, and DOES 1 through 50, inclusive, to engage in the unlawful and unconstitutional conduct as herein alleged with at total indifference to the rights of affected parents, including Plaintiffs herein.

90. The City of Philadelphia knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency policies, practices, customs, and usages would, and did, cause Plaintiffs to be injured and damaged by the City of Philadelphia's wrongful policies, or deliberate lack thereof or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in contravention of public policy and their legal duties and obligations to Plaintiffs; and that such policies were the moving force behind the violation of Plaintiffs' constitutional rights as alleged herein above. Namely, Plaintiffs' civil rights were violated, as mentioned above, when SOCIAL WORKER DEFENDANTS and DOES 1 through 50, while acting under color of state law and in conformance with official City of Philadelphia policies, conspired and/or acted to seize Plaintiffs' Pre Adoptive child without a warrant; and then lied about Plaintiffs in various court reports submitted to the Juvenile Court.

91. Defendant City of Philadelphia, including through its entity DHS, and DOES 1-50 and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiff to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Plaintiff under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to substantive and procedural due process.

92. Defendant City of Philadelphia, including through its entity DHS and DOES 1-50 also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within DHS, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

93. Moreover, based on the duties charged to the SOCIAL WORKER DEFENDANTS, including the responsibility to present evidence and recommendations to the juvenile court – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents. The County and its policymaking officials knew or should have known of the need to establish customs, policies, and practices required to protect the civil rights of children with whom their agents regularly came into contact – and to adequately train its employee social workers, agents, and/or officers on constitutionally appropriate policies and practices.

94. The Defendant City of Philadelphia and or DHS established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and

carried out by the SOCIAL WORKER DEFENDANTS and DOES 1-50 when they violated Plaintiffs' constitutional rights by engaging in deception in the presentation of evidence to the juvenile court, among other things.

95. At the time of the underlying events, the regularly established customs and practices of the City of Philadelphia and the DHS were followed, adhered to, complied with, and carried out by SOCIAL WORKER DEFENDANTS and DOES 1-50, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights include, but not limited to: a. The policy, custom, and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court. b. The policy, custom, and/or practice of suppressing and/or omitting known exculpatory evidence in the documents and/or reports filed with the juvenile court. c. The policy, custom, and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, to bolster the credibility of the document, and/or report were true.

96. When Defendants Colon, Dixon, Gale, Vann, Gallelli, and DOES 1 through 50, and each of them, engaged in deception in the presentation of evidence to the juvenile court, they were acting pursuant to and in accordance with the County's customs and/or practices. Indeed, the reports and/or other documents, filed with the juvenile court, were reviewed and approved by DHS and or NET CUA supervisors.

97. County social workers engaging in deception in the presentation of evidence to the juvenile court was not an isolated incident specific to Plaintiffs' circumstances or the circumstances of this case. Instead, the County and its social workers regularly include false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Such deceptive conduct by County social workers has resulted in lawsuits and claims against multiple offending social workers (for violation of constitutional rights) and Philadelphia County (for its customs being the moving force behind these violations). Yet, the Defendant City of Philadelphia and or DHS deliberately turned a blind eye to the problem and refrained from taking any reasonable steps to rectify it.

98. The Defendant City of Philadelphia and or DHS has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis and continues to engage in these practices on an ongoing and daily basis.

99. The Defendant City of Philadelphia and or DHS regularly receives and/or is aware of complaints, leveled against its social workers, claiming that the social workers are engaging in deception in the presentation of evidence in the juvenile court.

100. The Defendant City of Philadelphia and or DHS never investigates or disciplines its social workers who engage in deception in the presentation of evidence to the juvenile court including the SOCIAL WORKER DEFENDANTS identified in this lawsuit. The City of Philadelphia consistently fails to investigate or discipline social workers and their supervisors who are involved in constitutional violations so that violations of citizen's constitutional rights have not only become accepted but are customary.

101. The County did not investigate or discipline Defendants Colon, Dixon, Gale, Vann, Gallelli and DOES 1 through 50, for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

102. The County refuses to admit that its social workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that Defendants Colon,

Dixon, Gale, Vann, Gallelli and DOES 1 through 50, violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

103. The Defendant City of Philadelphia and or DHS is aware that its social workers make false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Yet, the Defendant City of Philadelphia and or DHS made a knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents/guardians and children to not be lied about in court reports and the requirement that all exculpatory evidence is presented to the juvenile court.

104. The Defendant City of Philadelphia and or DHS decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

105. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff harm, in that the Defendants Colon, Dixon, Gale, Vann, Gallelli and DOES 1 through 50, followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of DHS when they made false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – none of which was constitutionally permissible.

106. Plaintiff is informed and believes, that Defendant City of Philadelphia and or DHS failed to establish, adopt, and/or implement policies, procedures, and training regarding the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments. Without such policies, procedures, customs and/or practices in place, the City of Philadelphia Social Workers were allowed and permitted to engage in conduct that was in violation of Plaintiff's constitutional rights as more specifically set out in the General Allegations above.

107. Defendant County's failure to adopt such policies and training was the moving force behind the violations of Plaintiffs' constitutional rights. Such failures include, but are not limited to: a. The City of Philadelphia and or DHS did not have a written policy, procedure, custom, practice and/or recurrent training delineating the constitutional protections afforded to a parent/guardian and child by the First and Fourteenth Amendments. b. The City of Philadelphia and or DHS did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker must disclose all known exculpatory evidence to the juvenile court including the fact the Plaintiffs had over 2 years of positive safety visits on record where the home and child was confirmed safe. c. The City of Philadelphia and or DHS did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker is precluded from including false statements in documents or reports to the juvenile. d. The City of Philadelphia and or DHS did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports to the court. e. The Defendant City of Philadelphia and or DHS did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to have personal knowledge of the facts and/or statements made in a petition, document, and/or report, when attesting to the veracity of those allegations, facts, and/or statements. f. The Defendant City of Philadelphia and or DHS did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to conduct

an independent investigation to determine whether the allegations, facts, and/or statements in a petition, document, and/or report were true, before attesting to the veracity of those allegations, facts, and/or statements. g. The Defendant City of Philadelphia and or DHS did not have a policy or procedure that addressed legal statutes in Pennsylvania concerning civil immunity for a social worker is lost if they commit perjury, fabricate evidence, or fail to provide known exculpatory evidence.

108. By deliberately refraining from promulgating any of the policies, procedures, customs, practices and/or training, the County permitted the basic policy decisions to be made by the lower level social workers in the field. As a result, the Defendant City of Philadelphia and or DHS policy, custom, and/or practice – as established, adopted, and implemented by Defendants Colon, Dixon, Gale, Vann, Gallelli, and DOES 1 through 50 – was to make false statements and/or suppress known exculpatory evidence in reports and documents filed with the juvenile court, and to continue to detain the child or otherwise cause the continued detention of the child even thought it was known that there was no factual basis to do so.

109. These policies, customs, and/or practices – that disregard the Plaintiffs' constitutional protections – were a substantial factor in causing harm to the Plaintiff. Thus, as a matter of law, because there was no formal policy preventing the aforementioned misconduct, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions – which is exactly what they did when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court, and then continued to allow Plaintiff T.H. to be moved to 4 foster care homes within 1 year and her continued detainment for almost 2 years from Plaintiff Tamiera Harris.

110. The state of the law regarding the constitutional protections afforded to a parent/guardian and child by the First and Fourteenth Amendments was clearly established well before December 22, 2017. As such, the Defendant City of Philadelphia and or DHS knew before 2017 that its county social workers required recurrent training on the constitutional protections afforded to a parent/guardian and child.

111. Despite this knowledge, the Defendant City of Philadelphia deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its county social workers on the following constitutional protections: a. That a social worker must disclose all known exculpatory evidence to the juvenile court. b. That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court. c. That a social worker is precluded from lying to and/or including false statements in documents or reports to the juvenile court. d. That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers. e. That a social worker is precluded from lying to and/or including false statements in documents and/or reports that will be relied upon by subsequent social workers. f. That quotation marks can only be used when the speaker's words are being reproduced verbatim.

112. The Defendant City of Philadelphia and or DHS deliberate failure to train its county social workers on these established constitutional protections was a substantial factor in causing the Plaintiffs' harm, in that DHS and NET CUA agents were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when the County's social workers, and/or agents, made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court, and then continued to detain T.H. from her Pre Adoptive Parent's care for almost 2 years even though they knew there was no legitimate basis to do so.

113. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom DHS and or NET CUA agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.

114. Defendant City of Philadelphia, including by and through its entity DHS and its policymaking officials, breached its duties and obligations to Plaintiff by, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and/or employees as to their compliance with constitutional safeguards; and by deliberately permitting Defendants Colon, Dixon, Gale, Vann and Gallelli, and DOES 1 through 50, to engage in the unlawful and unconstitutional conduct as herein alleged, with a total and deliberate indifference to Plaintiffs' rights.

115. Defendant City of Philadelphia knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency policies, practices, customs, and usages would, and did, directly cause Plaintiff to be injured and damaged by Defendant City of Philadelphia's wrongful practices, or deliberate lack of official policies to prevent the known practices from occurring.

116. Namely, Plaintiffs' civil rights were violated, as mentioned above, when SOCIAL WORKER DEFENDANTS and Police Defendants Conaway and Martella, while acting under color of state law and in conformance with official City of Philadelphia policies, conspired and/or acted to seize Plaintiffs' Pre Adoptive child and Maternal Cousin without a warrant or judicial removal order.

117. These actions, and/or inactions, of the Defendant City of Philadelphia and Cynthia Figueroa were the moving force behind, and direct and proximate cause of the Plaintiff's injuries. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

118. These actions, and/or inactions, of the City of Philadelphia are the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

119. This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

## CLAIM 4: RELIEF FOR VIOLATION OF STATE CIVIL RIGHTS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE

120. Plaintiffs realleges, and to the extent applicable, incorporates herein as if set forth in full, each of the foregoing paragraphs.

121. Plaintiffs are informed and believe and thereon allege that County SOCIAL WORKER DEFENDANTS and City Police Defendants, by the use of threats, intimidation, deception, fraud,

and coercion (or attempts to threaten, intimidate, deceive, defraud, and coerce), interfered with Plaintiffs' exercise and enjoyment of the rights secured by the United States Constitution and other Federal laws, the Constitution and laws of the State of Pennsylvania including Civil Rights Violations under Title 42 and other applicable statutory and case law.

122. As to the individual SOCIAL WORKER DEFENDANTS, such conduct includes, but is not limited to, the wrongful seizure of T.H., the continued detention of T.H. after any alleged basis for detention had been negated, the procuring of false testimony, fabrication of evidence, refusal to disclose exculpatory evidence in preparing and presenting reports and documents to the Court in relation to dependency proceedings, and the denial of reasonable accommodations, all in violation of the right to familial association and privacy arising under the Fourteenth Amendment.

123. As to the Police Defendants, such conduct includes, but is not limited to, the wrongful seizure of T.H., the use of excessive force to snatch T.H from Plaintiffs Tamiera Harris hands without a warrant or Judicial court order for removal.

124. Plaintiffs are informed and believe and therefore allege that government searches and seizures are inevitably acts of "political violence" that causes fear, degradation, humiliation, and indignity along with its obvious physical impacts including confinement. (Doriane Lambelet PA Coleman, Storming the Castle to Save Children: The Ironic Costs of Child Welfare Exception to the Fourth Amendment, 47 Wm. & Mary L. Rev. 413, 422 fn. 20 (2005); relied upon for other reasons in Greene v. Camreta (9th Cir. 2009) 588 F.3d 1011, 1016.)

125. The City of Philadelphia is vicariously responsible for the conduct of its social services agents, and the City of Philadelphia is vicariously responsible for the conduct of its police officers, pursuant to Pennsylvania Code Title 42 § 8542, and other applicable statutory and case law.

126. As the direct and proximate result of these actions of the City of Philadelphia and City of Philadelphia public employees, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial.

127. The rights violated by the public employees mentioned herein, and each of them, are protected by 42 PA Cons Stat § 8309, which entitle Plaintiffs to compensatory and punitive damages, injunctive relief, statutory civil penalty (where applicable) and attorney's fees, as provided for by the laws and the Constitution of the State of Pennsylvania and are requested herein.

128. In doing the acts alleged in this Complaint, SOCIAL WORKER DEFENDANTS, Police Defendants, and DOES 1 through 50, and each of them, knew or should have known that their actions would, or were likely to, injure and damage Plaintiffs. Plaintiffs are informed and believe and thereon allege that the SOCIAL WORKER DEFENDANTS, Police Defendants, and DOES 1 through 50, and each of them, intended to cause injury and damage to Plaintiffs, and/or acted with a willful and conscious disregard of Plaintiffs' rights, thus entitling Plaintiffs to recover punitive damages as against said social services agents and police defendants.

**CLAIM 5: RELIEF FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE**

129. Plaintiffs reallege, and to the extent applicable, incorporate herein as if set forth in full, each of the foregoing paragraphs. Plaintiffs are informed and believe that County SOCIAL WORKER DEFENDANTS, engaged in the above-mentioned extreme, outrageous, unlawful and unprivileged conduct, including, but not limited to removing and detaining T.H. from the love and care of his

Preadoptive Parent who had care and custody of the child since birth for 2 years and bared the child's last name due to the preadoptive arrangement without court order or exigent circumstances

130. The SOCIAL WORKER DEFENDANTS continued to detain T.H. without any basis for doing so; extracting an agreement to follow a "Safety Plan with the maternal grandmother that denied the Plaintiff the right to be left alone with child T.H." through the use of undue influence, coercion, and duress; and continuing to harass, annoy, and lie to Plaintiffs, and otherwise interfere with Plaintiffs' lives, when no exigency or need existed. These acts exceeded the bounds of common decency usually tolerated by a civilized society.

131. Plaintiffs are informed and believe and thereon allege that the SOCIAL WORKER DEFENDANTS knew, agreed with, aided and abetted, and supported the above described conduct and thereby collaborated, acted, and conspired to violate Plaintiffs' civil rights.

132. Plaintiffs are informed and believe that the SOCIAL WORKER DEFENDANTS, and DOES 1 through 50, and each of them, intended to cause harm to Plaintiffs, or acted with reckless disregard for the possibility that Plaintiffs would suffer extreme emotional distress because of the outrageous conduct listed above. Based on the nature of their work, which can include the use of governmental force to turn children into wards of the state, each of the SOCIAL WORKER DEFENDANTS owed a special duty of care to Plaintiff, and knowing of said duty, abused this special relationship and/or position which gave them power to damage the Plaintiffs' interest, in egregious fashion; they knew of Plaintiffs' susceptibility to injuries through mental distress in order to inflict trauma; and/or they acted intentionally or unreasonably with the recognition that the acts were likely to result in illness through mental distress. Said actions were performed with deliberate and callous indifference to the liberty interests of Plaintiffs, such that said public employees' actions assault and shock the public conscience.

133. As the direct and proximate result of the extreme and outrageous conduct of the SOCIAL WORKER DEFENDANTS and DOES 1 through 50, and each of them, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

134. Plaintiffs are informed and believe and thereon allege that the SOCIAL WORKER DEFENDANTS acted knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for punishing all defendants and to deter them and others from such conduct in the future.

135. City of Philadelphia is vicariously responsible for the conduct of its public employees, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 6: RELIEF FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50

136. Plaintiffs reallege, and incorporate herein as if set forth in full, and all the preceding paragraphs inclusive.

137. By the relationship between T.H. and County, including as between T.H. and the individual County social services agents, a fiduciary duty existed relating to the provision of reasonable care and a safe environment to T.H.

138. Further, because County assumed wardship of T.H., it owed her family and Pre Adoptive Parent, as part of Tamiera Harris's familial liberty interest, reasonable safety and adequate care of T.H. A preexisting relationship between County and Plaintiffs therefore existed at all relevant times mentioned herein.

139. County and its agents and employees, breached their respective duties of care by, but not limited to, continuing to detain T.H. for an unreasonable period after any alleged basis for detention had been negated; placing T.H. in a situation where it was reasonably foreseeable that T.H. would suffer mental and physical abused and was consequently battered suffering from facial injuries in her non family foster care placement and neglect which caused her vagina area to be left untreated and raw in her second foster care placement. T.H. was moved to a total of 4 non family foster care homes in 1 year when there were multiple legal custody petitions filed by her biological family (Maternal Grandmother, Maternal Cousin and Maternal Aunt who was T.H. back up guardian on record with the court, DHS and NET CUA as T.H. respite care provider and backup guardian.

140. Each of the SOCIAL WORKER DEFENDANTS owed Plaintiffs the following statutory duty: Before taking a minor into custody, a social worker shall consider whether the child can remain safely in his or her residence. The consideration of whether the child can remain safely at home shall include, but not be limited to, the following factors: (1) Whether there are any reasonable services available to the worker which, if provided to the minor's parent, guardian, caretaker, or to the minor, would eliminate the need to remove the minor from the custody of his or her parent, guardian, or caretaker. (2) Whether a referral to public assistance would eliminate the need to take temporary custody of the minor. If those services are available, they shall be utilized. (3) Whether a nonoffending caretaker can provide for and protect the child from abuse and neglect and whether the alleged perpetrator voluntarily agrees to withdraw from the residence, withdraws from the residence, and is likely to remain withdrawn from the residence.

141. County and SOCIAL WORKER DEFENDANTS breached their respective duties of care by, but not limited to, failing to even consider - as they are required to do - whether T.H. could, with the provision of reasonable services, remain safely with her Pre Adoptive Parent after it was alleged there was no car seat inside the home and no baby food for a child who was 2.5 years of age. County and SOCIAL WORKER DEFENDANTS breached their respective duties of care by, but not limited to, failing to perform any assessment at all, much less the mandatory assessment of the statutory factors, prior to the removal of T.H. from her Pre Adoptive Parent's custody.

142. Plaintiff is informed and believes and thereon alleges that, had the abovementioned abduction of a child been performed by private citizens, such act would have been criminal, but would entitle Plaintiffs to bring civil suit for compensatory and punitive damages.

143. As the direct and proximate result of the County's social services agents negligent conduct, Plaintiffs have suffered extreme emotional and physical distress, including but not limited to fright, nervousness, sleeplessness, anxiety, worry, mortification, shock, humiliation, and indignity, to an extent and in an amount subject to proof at trial. Nobody, including Plaintiffs, could reasonably be expected to endure the types of affront inflicted upon Plaintiffs without sustaining the type of damages herein alleged.

144. Plaintiffs are informed and believe and thereon allege that County social services agents acted knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for punishing said governmental agents, and to deter them and others from such conduct in the future.

145. City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 7: RELIEF FOR FALSE IMPRISONMENT BY T.H. AGAINST COUNTY; SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE

146. Plaintiffs reallege, and to the extent applicable, incorporate herein as if set forth in full, each of the foregoing paragraphs.

147. As mentioned above, SOCIAL WORKER DEFENDANTS seized T.H. from her preadoptive home without a removal order signed by a judge.

148. Said confinement in non-family foster care was nonconsensual, was undertaken without judicial authorization, and without the SOCIAL WORKER DEFENDANTS being in possession of any evidence to suggest that T.H. was in imminent danger of serious bodily injury or death at the hands of her Pre Adoptive Parent.

149. The above mentioned detention was not authorized by law and took place for an appreciable length of time for almost 2 years.

150. As the direct and proximate result of the dereliction of duty of the SOCIAL WORKER DEFENDANTS, Plaintiff has had her familial liberty interests violated, and has suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses, to an extent and in an amount subject to proof at trial.

151. Plaintiffs are informed and believe and thereon allege that the SOCIAL WORKER DEFENDANTS acted knowingly and willfully, with malice and oppression, and with the intent to harm Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages for punishing SOCIAL WORKER DEFENDANTS, and to deter them and others from such conduct in the future.

152. City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

153. In addition to compensatory damages, attorneys' fees, and costs, Plaintiff is entitled to punitive damages as authorized by Pennsylvania Title 42 § 8550 and other applicable statutory and case law, to deter the SOCIAL WORKER DEFENDANTS, from committing the same egregious acts in the future.

## CLAIM 8: RELIEF FOR ASSAULT BY T.H. AGAINST COUNTY; SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE

154. Plaintiffs reallege, and incorporate herein as if set forth in full, and all the preceding paragraphs inclusive.

155. As mentioned above, these SOCIAL WORKER DEFENDANTS, and each of them, conspired to violate Plaintiff T.H.'s civil rights, by, but not limited to, seizing and abducting T.H. from the care and custody of Tamiera Harris, without a warrant, parental consent, or exigent circumstances; and committing perjury, fabricating evidence and suppressing exculpatory evidence. As part of the continuum of events comprising said violations of civil rights, SOCIAL WORKER DEFENDANTS Colon and Dixon intentionally, willfully, wantonly, and maliciously threatened to seize T.H.'s person and physically sever her from the care and custody of her maternal cousin and Pre Adoptive Parent Tamiera Harris, without a warrant, without parental consent, and in the absence of exigent circumstances. Plaintiff T.H. did not consent to such conduct.

156. As a direct and proximate result of the threatening conduct of Defendants Colon and Dixon, as mentioned above, coupled with their present ability to carry out the threat, Plaintiff T.H. reasonably

felt the imminent apprehension of such contact, and therefore suffered severe emotional distress and other serious injuries to her person, in an amount to be shown according to proof.

157. By joining the conspiracy to violate Plaintiff T.H.'s civil rights, SOCIAL WORKER DEFENDANTS, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned acts of defendants Colon and Dixon.

158. T.H. is informed and believes that the aforesaid acts were carried out with the base and vile motivation of seizing and abducting T.H., before her Preadoptive Parent, Tamiera Harris, could contest their illegal plan. Said acts were done with a conscious disregard of Plaintiff T.H.'s right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud or malice pursuant to Pennsylvania Title 42 § 8550, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of said SOCIAL WORKER DEFENDANTS.

159. City of Philadelphia is vicariously responsible for the conduct of its SOCIAL WORKER DEFENDANTS, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 9: RELIEF FOR BATTERY BY T.H. AGAINST ALL DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE

160. Plaintiffs reallege, and incorporate herein as if set forth in full, and all the preceding paragraphs inclusive.

161. As mentioned above, these SOCIAL WORKER DEFENDANTS and Police Defendants, and each of them, conspired to violate Plaintiff T.H.'s civil rights, by, but not limited to, seizing and abducting T.H. from the care and custody of maternal cousin and Preadoptive Parent Tamiera Harris, without a warrant, parental consent, or exigent circumstances; and, as to the SOCIAL WORKER DEFENDANTS, committing perjury, fabricating evidence and suppressing exculpatory evidence. As part of the continuum of events comprising said violations of civil rights, Social Worker Colon and Dixon, with the concurrence of Police Defendants, intentionally and/or recklessly grabbed T.H. and forcibly took her to a car without a warrant or court order of removal signed by a Judg. Neither T.H., nor her Pre Adoptive Parent Tamiera Harris, consented to the said harmful or offensive touching.

162. Social worker Colon did the acts with the intent to cause a harmful or offensive contact to the body of Plaintiff, T.H.

163. As a direct and proximate result of the conduct of these Defendants, as mentioned above, Plaintiff suffered severe emotional distress and other injuries to her person, in an amount to be shown according to proof.

164. By joining the conspiracy to violate Plaintiff T.H.'s civil rights, SOCIAL WORKER DEFENDANTS, and each of them, are responsible for all acts done as part of the conspiracy, whether the acts occurred before or after he or she joined the conspiracy, including the aforementioned acts of defendants Colon and Dixon, the Police Defendants, and each of them, are likewise responsible for the acts committed because they knew in advance, concurred, and agreed, with the intended seizure and abduction of T.H.

165. Plaintiff Tamiera Harris and her Pre Adoptive Child, T.H., have a protected liberty interest in the privacy and integrity of their family unit, free of unwarranted governmental intrusion.

166. County, by and through its SOCIAL WORKER DEFENDANTS, and City, by and through its Police Defendants, intruded upon the privacy of Plaintiffs' family by, but not limited to, removing T.H. from the family home without judicial authorization, without parental consent, and in the

absence of exigent circumstances; failing to discharge their duty to consider whether T.H. could remain safely in her residence with her Preadoptive Parent, prior to removal; and continuing to detain T.H. after any purported reason for doing so had been extinguished when the Defendant notified all SOCIAL WORKER DEFENDANTS and Defendant Figueroa in her official capacity that the allegations were fabricated based on pictured evidence included in the court record that confirmed the child had a car seat, pictures of the Plaintiffs refrigerator two days prior to the removal which confirmed there was food for the child and the confirmation of video screenshots that there was audio and video evidence of the home visit which confirmed that the SOCIAL WORKER DEFENDANTS committed perjury and Judicially deceived the court for almost 2 years in order to prolong the seizure of T.H. Each act mentioned above was carried out intentionally, and with full knowledge of the probable consequences thereof.

167. Said intrusions upon the family home and privacy interests of Plaintiffs would be highly offensive to any reasonable person, and was, in fact, highly offensive to Plaintiffs.

168. As the direct and proximate result of the County's social services agents' dereliction of duty, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, to an extent and in an amount subject to proof at trial.

169. T.H. is informed and believes that the aforesaid acts were carried out with the base and vile motivation of seizing and abducting T.H., before her maternal cousin and Pre Adoptive Parent, Tamiera Harris contest their illegal plan in front of a Judge. Said acts were done with a conscious disregard of Plaintiff T.H.'s right to be free from such tortious and criminal behavior, such as to constitute oppression, fraud or malice pursuant to Pennsylvania Title 42 § 8550, entitling Plaintiff to punitive damages in an amount appropriate to punish and set an example of said SOCIAL WORKER DEFENDANTS and Police Defendants.

170. City of Philadelphia is vicariously responsible for the conduct of its SOCIAL WORKER DEFENDANTS, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 10: RELIEF FOR ABUSE OF PROCESS BY ALL PLAINTIFFS AGAINST SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE

171. Plaintiffs reallege, and to the extent applicable, incorporate herein as if set forth in full, each of the foregoing paragraphs.

172. City of Philadelphia and SOCIAL WORKER DEFENDANTS misused the juvenile court process by, but not limited to, misusing governmental process to seize, remove, and detain T.H., without notice to the Pre Adoptive Parent or their consent, without an authorizing court order or warrant, and in the absence of exigent circumstances.

173. City of Philadelphia and SOCIAL WORKER DEFENDANTS in so misusing the process in the above-described manner intended to prolong T.H. and her family into dependency proceedings, thereby enabling County, among others, to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to: funding by the State and Federal governments; invade the privacy of Plaintiffs' family; break Plaintiffs' will and punish them for refusing to submit to the will of SOCIAL WORKER DEFENDANTS; to retaliate for Plaintiff Tamiera Harris blowing the whistle on their performance issues and failure to follow child welfare laws in the State of Pennsylvania; seek revenge; or achieve some other nefarious end.

174. At all times mentioned herein, the SOCIAL WORKER DEFENDANTS acted willfully, with the wrongful intention of injuring Plaintiffs, and with an improper and evil motive amounting to malice. Therefore, Plaintiffs are entitled to an award of punitive damages from SOCIAL WORKER DEFENDANTS and DOES 1-50 to deter them and others from such conduct in the future.

175. City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 11: RELIEF FOR INVASION OF PRIVACY BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE

176. Plaintiffs reallege, and to the extent applicable, incorporates herein as if set forth in full, each of the foregoing paragraphs.

177. Plaintiff Tamiera Harris and her Pre Adoptive child, T.H., have a protected liberty interest in the privacy and integrity of their family unit, free of unwarranted governmental intrusion. County, by and through defendants Colon, Dixon, Conaway and Martella, intruded upon the privacy of Plaintiffs' family by, but not limited to, removing T.H. from the care and custody of her maternal cousin and Pre Adoptive Parent, Tamiera Harris, without parental consent, and in the absence of exigent circumstances without court decree, or exigent circumstances; continuing to detain T.H. without basis; and holding a child hostage in order to gain coerced consent to continued involvement of government officials in the family life. Each act mentioned above was carried out intentionally, and with full knowledge of the probable consequences thereof even after plaintiffs submitted evidence to Defendants that all allegations were not only false but fabricated to continue the detainment of child T.H. from her biological family and to hurt and cause trauma to all Plaintiffs.

178. Said intrusions upon the family home and privacy interests of Plaintiffs would be highly offensive to any reasonable person, and was, in fact, highly offensive to Plaintiffs.

179. As the direct and proximate result of the County's social services agents' dereliction of duty, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Plaintiffs have also incurred, and will continue to incur, attorneys' fees, costs and expenses, to an extent and in an amount subject to proof at trial.

180. Plaintiffs are informed and believe that at all times mentioned herein, the Social Worker and Police Defendants acted willfully with the wrongful intention of intruding upon Plaintiffs and for an improper and evil motive amounting to malice in that the tortious and criminal conduct was intentionally committed by the SOCIAL WORKER DEFENDANTS that was knowingly oppressive, malicious and wanton with the intended purpose to cause harm to Plaintiffs. Therefore, Plaintiffs are entitled to an award of punitive damages from Social Worker and Police Defendants to deter them and others from such conduct in the future.

181. City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542 and other applicable statutory and case law.

## CLAIM 12: RELIEF FOR DECLARATORY RELIEF BY ALL PLAINTIFFS AGAINST CITY OF PHILADELPHIA; SOCIAL WORKER DEFENDANTS; AND DOES 1 THROUGH 50, INCLUSIVE

182. Plaintiffs reallege, and to the extent applicable, incorporate herein as if set forth in full, each of the foregoing paragraphs.

183. As stated herein, Plaintiffs, as citizen and individuals, are protected by the laws of the State of Pennsylvania, as well as those of the United States Constitution, including the Fourth and Fourteenth Amendments thereto.

184. As stated herein, Defendants City of Philadelphia, and DOES 1 through 50, inclusive, have wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs, and with utter disregard of County's duties and obligations to Plaintiffs, acted, practiced and/or adopted policies, practices, procedures and/or customs which are in violation of the rights of Plaintiffs, including those to be free from governmental interference as to their familial associations and from unreasonable searches or seizures, including those relating to child abuse allegations and related actions and proceedings.

185. City of Philadelphia has failed to acknowledge their improper, unlawful and unconstitutional actions, conduct and policies at the time of the incidents at issue in the present action, and Plaintiffs are informed and believe, and on that basis allege, that presently City of Philadelphia has not changed or modified such actions, conduct and/or policies to conform to law.

186. The City of Philadelphia recorded over two years of positive safety visits to the child T.H. home where the child resided with the Plaintiff Tamiera Harris since birth.

187. None of the allegations of no car seat inside the home and no baby food for a 2.5 year old made logical sense since the child T.H. was happy, healthy and growing up in a home where she was the only child of Plaintiff Tamiera Harris who made over six figures from her day job and had no credit card debt, no car note debt, no mortgage debt and who prepaid her living expenses in advance according to DHS and NET CUA testimony on March 22, 2018.

188. County's wrongful and unlawful conduct, actions and/or policies, unless and until enjoined and restrained by order of this court, will cause, and continue to cause, great and irreparable injury to Plaintiffs, and other individuals and citizens, in that City of Philadelphia will continue to act in accordance with said unlawful policies, and with deliberate indifference to their duties and obligations under state and federal law, including those under the Fourth and Fourteenth amendments as alleged hereinabove.

189. In addition, so long as T.H., remains a minor, all the acts mentioned herein are repeatable.

190. Plaintiffs have no adequate remedy at law to prevent or prohibit City of Philadelphia from continuing, and/or repeating, its unlawful and unconstitutional conduct and policies other than through injunctive relief, and therefore seeks an order enjoining and prohibiting City of Philadelphia and DHS by, but not limited to, the following: a. the policy of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious bodily injury), court order and/or consent; b. the policy of removing children from their family and their homes without first obtaining a warrant when no exigency exists; c. the policy of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated; d. the policy of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with custody, adoption or parental rights, including those as to familial relations; e. by acting with deliberate indifference in implementing a policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when performing actions related to child abuse and dependency type proceedings; f. the practice of setting forth allegations in

Juvenile Dependency Petitions against parents/guardians regardless of whether or not specific, articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury; g. the policy, practice, or custom of making knowingly false allegations of child abuse, neglect, or noncompliance in Juvenile Dependency Petitions signed under penalty of perjury as a means of intimidating parents, by coercion, into accepting lesser charges, whether true or not and whether justified by extant evidence or not, thereby enabling the county to keep the family in the juvenile dependency system and record the case as a positive outcome for purposes of statistical analysis related to funding by the State and Federal governments; and h. the custom, policy, and/or practice of fraudulently charging parents with child abuse, creating fabricated safety complaints or making allegations of neglect where none exists.

191. This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

## PRAYER

WHEREFORE, Plaintiffs, Tamiera Harris and T.H., prays for judgment against Defendants, as to all causes of action, as follows: General damages and special damages according to proof, but in no event less than $12,127,002; As against only the individual defendants and not any municipality, punitive damages as allowed by law; Attorney's fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute; Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief to be based upon a separate application); Costs of suit incurred herein; and Such further relief as the Court deems just and proper.

Dated: October 17, 2019

Dr. Tamiera S. Harris, Plaintiff in Pro Per

# EXHIBIT LIST

These exhibits represent a small portion of the misconduct and lack of oversight and accountability of All Defendants. This list is nowhere near exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Additional and even more damaging evidence may be revealed during litigation regarding the allegations under the Claims for relief.

**Exhibit A:** Notice of fear of retaliation to Mayor James Kenney and Defendant DHS Commissioner Cynthia Figueroa August of 2017 after Plaintiff filed Grievances for Performance issues against DHS and NET CUA which included pictures, emails, audio and video which confirmed Social worker Defendants fabricated a safety and or that DHS and CUA had failed to follow policies, procedures, child welfare laws and the constitutional rights of the Plaintiffs.

**Exhibit B:** Request for family placement of T.H. by back up family Guardian Tyeffa Harris and NET Guardianship Agreement.

**Exhibit C:** Text Messages Between Plaintiff Tamiera Harris and Social Workers or CUA representatives showing compliance with safety visits for over 2 years.

**Exhibit D:** Motion for Contempt of Court for Perjury Filed by Maternal Grandmother of Plaintiff T.H. which shows DHS and CUA was on notice since July 17, 2018 that the safety allegations were fabricated and/or did not exist.

**Exhibit E:** Travel Agreement, Act 75 Law and Summary of Plaintiff Tamiera Harris Meeting at DHS office to review final adoption requirements and travel requirements.

**Exhibit F:** Notice by Plaintiff of Audio and Video Recording hung outside of Apartment which provided notice to Social worker and Police Defendants that they would be recorded if they decided to enter the apartment.

**Exhibit G:** Interview with Internal Affairs for Complaint filed by Plaintiff against Police Defendants for conspiring and committing an unlawful and warrantless seizure without a court order or exigent circumstances.

**Exhibit H:** Notice of pending litigation and Final Notification of Litigation

DR. TAMIERA HARRIS

4821 Unruh Avenue

Philadelphia, Pennsylvania 19135

215-987-6860

tamieraharris@gmail.com

Plaintiff in Pro Per

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMIERA HARRIS, AN INDIVIDUAL; T.H., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM,<br><br>Plaintiff(s)<br><br>vs.<br><br>CITY OF PHILADELPHIA, PHILADELPHIA POLICE DEPARTMENT; DEPARTMENT OF HUMAN SERVICES; NET COMMUNITY CARE; CYNTHIA FIGUEROA; MIRIAM COLON; KENNETH DIXON; CHARISE GALE; TIFFANY VANN; CATERINA GALLELLI; SHARON CONAWAY; CRAIG MARTELLA; AND DOES 1 THROUGH 50, INCLUSIVE,<br>Defendant(s) | Case No.:<br><br>COMPLAINT FOR DAMAGES<br>CLAIM 1: VIOLATION OF FEDERAL CIVIL RIGHTS 42 U.S.C. § 1983 (UNWARRANTED SEIZURE)<br><br>CLAIM 2: 42 U.S.C. §1983 (JUDICIAL DECEPTION)<br><br>CLAIM 3: MONELL-RELATED CLAIMS<br><br>CLAIM 4: VIOLATION OF STATE CIVIL RIGHTS<br><br>CLAIM 5: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>CLAIM 6: NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS<br><br>CLAIM 7: FALSE IMPRISONMENT<br><br>CLAIM 8: ASSAULT<br><br>CLAIM 9: BATTERY<br><br>CLAIM 10: ABUSE OF PROCESS<br><br>CLAIM 11: INVASION OF PRIVACY<br><br>CLAIM 12: DECLARATORY RELIEF<br><br>**[JURY TRIAL DEMANDED]** |

**CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of this lawsuit to all parties and or their counsel via certified and first class mail on October 17, 2019 and Final Notification on November 18, 2019. The names and addresses of persons served are below.

City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia PA 19102

NET CUA Organization, Northeast Treatment Centers, Inc.
499 N. 5th Street, Suite A
Philadelphia PA 19123

Philadelphia DHS
1515 Arch Street, 14th Floor
Philadelphia Pa 19102

Cynthia Figueroa
1515 Arch Street, 8th Floor
Philadelphia PA 19102

Kenneth Dixon
1515 Arch Street, 8th Floor
Philadelphia PA 19102

Charise Gale
4404 North 5th Street
Philadelphia PA 19140

Miriam Colon
4404 North 5th Street
Philadelphia PA 19140

Caterina Galleli
4404 North 5th Street
Philadelphia PA 19140

Philadelphia Police Department
750 Race Street
Philadelphia PA 19106

Sharon Conaway
3100 Red Lion Road
Philadelphia PA 19114

Craig Martella
3100 Red Lion Road
Philadelphia PA 19114

Tiffany Vann
4404 North 5th Street
Philadelphia PA 19140

By: _____
Dr. Tamiera Harris
4821 Unruh Avenue
Philadelphia PA, 19135
tamieraharris@gmail.com
215-987-6860

3

Exhibit A
1 of 2

M

---

**Fwd: Mayor Kenney Fwd: Child removal Tamia Harris response confirmed by Mayor's office within 14 business days**
1 message

Tamiera Harris <tamiera.harris@gmail.com>
To: Tamiera Harris <tamiera.harris@ppdi.com>                                                    Tue, Oct 15,

---

---------- Forwarded message ----------
From: **Tamiera Harris** <tamiera.harris@gmail.com>
Date: Mon, Mar 25, 2019, 9:09 PM
Subject: Mayor Kenney lawsuit Fwd: Child removal Tamia Harris response confirmed by Mayor's office within 14 business days
To: Tamiera Harris <tamiera.harris@gmail.com>

---------- Forwarded message ----------
From: **Tamiera Harris** <tamiera.harris@gmail.com>
Date: Fri, Apr 27, 2018, 5:18 PM
Subject: Re: Child removal Tamia Harris response confirmed by Mayor's office within 14 business days
To: James Kenney <James.Kenney@phila.gov>
Cc: Cynthia Figueroa <Cynthia.Figueroa@phila.gov>, Smith, Carolyn <csmith@pahouse.net>, <brrios@pa.gov>

Dear Mayor Kenney,

I want you to be informed that I have attempted to get in contact you in regards to the retaliation I experienced with a simple family placed adoption in regards to Tamia Harri reached out to Commissioner Figueroa and she has not responded. I have NET Community Care Workers on video confirming we had a positive safety and home inspection misled the court on 3-22-2018 and caused a child to be removed from her permanent home due to my previous grievances against the agency. Due to my fear of retaliation I outside and in my home alerting that all who entered would be audio and video recorded for transparency purposes if they decided to enter. I also reported to you that I feare retaliation back in August of 2017 and it happened anyway.

Thanks to google I have access to positive safety check visit videos all date stamped. I want you to be aware of this video from 12-8-2017 and how my only child whom I rais was unlawfully removed when no safety issues ever existed and how she was not placed with any family after her Aunts and Grandparents have requested to get her and req visitation. Tamia's Grandmother who has been copied on emails Carolyn Smith since February 2017 works for the Honorable State Representative Curtis Thomas for over 20 has been a witness to the agreements and the progress we made with the adoption which were all positive. This video screenshots attached shows us reviewing safety of th home, the child's room, food and we reviewed the final family profile and signed off on it for the adoption and signed off on a NET authored inspection report. The video also the workers confirming that the home and child was safe. I want these workers investigated and they are Tiffany Vann, Caterina Galleli and Miriam Colon from NET Communi Kenneth Dixon from DHS. DHS claimed they removed her because of a safety complaint from Caterina Galleli on 12-8-2017 visit however per visit we signed off on the home and family profile without any issues. She also never mentioned any issues in follow up communication for over a week. Philadelphia children under NET CUA and DHS are no unlicensed "social workers" and or mandated reporters are willing to take make up false reports to take a child maliciously without any regard for the child's best interest and court order just 3 days before Christmas. Then my daughter has been bounced around to two foster care homes within 4 months where she is not doing well. How could they us? Can you please confirm the results of your investigation when I reported this in December of 2017?

1. These workers initially stated to Philadelphia Police that they removed her because adoption training was not completed then I showed them that is was completed 8 mon The video is linked.
2. They then changed their story and went to court and stated the child did not have a car seat inside the home. As you can see from the attached picture, our car seat is kept and the child is pictured in her car seat. I also have receipts for all of this child's clothing and furniture purchases since 2015!
3. They also stated we did not notify them of a tentatively planned vacation that we didn't even get to take due to the snow storm so I attached the email as they were indeed based on the agreed upon method.
4. These workers also stated a business was in the child's name which it is not per the state of PA it is in my name!
5. Finally they mentioned they did not see typical items such as mayo or mustard in the refrigerator and that our refrigerator was too clean. I do not eat mayonnaise and we a 2 who gets food deliveries from peapod by giant since 2015 and in the history of almost 3 years I have never ordered mayo or mustard. Again thanks to google, I have a pictu refrigerator contents just before she was removed since we decided to vacation locally and went to do food shopping for a Christmas dinner I was planning. They also check video that there were over 30 freezer meals in the freezer alone during their 12-8-2017 visit, that she had several boxes of cereal, milk, juice and fruit, we did a clothing invent checked the safety of the home.

I am still searching for how the above allegation by NET CUA was not properly investigated before a child was removed from her biological family. I am also concerned that I of Kenneth Dixon admitting that upper management DHS approved a child removal days earlier before investigating the claim, visiting the home or seeing the child. This has policy. I want a meeting to discuss further and to share the video which has audio in hopes that this does not happen to another pre adoptive family again without a proper in and due process.

I am saddened that I have to even fight this but I will never give up on my child. You see how I am able to easily pull information. This is what happens if a prospective adopti properly notified of a safety complaint. What are you going to do to reunite a innocent child back with her biologically family after she was maliciously removed in error when issues ever existed?

Thank you,

Dr. Tamiera Harris
215-987-6860

On Wed, Jan 17, 2018 at 8:52 AM, Tamiera Harris <tamiera.harris@gmail.com> wrote:
  Dear Mayor Kenney,

  I am expecting a response today regarding the removal of Tamia Harris dob 7/27/15 from her preadoptive home on 12-22-2017 per your previous email. It was confirmed b
  that they took the child I raised since birth due to not finishing adoption training. However they made a terrible mistake. Tamia Harris dob 7/27/15 from her preadoptive home completed all sessions of training 8 months ago! I went my child home today! NET CUA and DHS did not allow visitation and I have not seen her in 26 days! This is not in th interest of this child to be away from the only mother she has known for 2 years and we are biologically related. The snippet of video below shows Philadelphia police conf 2018 why she was removed. NET CUA Director Leticia Lacomba and Supervisor Charise Gale confirmed outstanding training. Please allow me to pick up Tamia today. I wa physical custody of her and plan on adopting her asap.

  https://m.youtube.com/watch?feature=share&v=ulncQj5rlns

Exhibit A
2 of 2

**James Kenney** <James.Kenney@phila.gov>
to me

12/23/17

*Dear Tamiera,*

*Thank you for taking the time to reach out to me. As Mayor, I remain committed to building an efficient and effective government that works for everyone, regardless of their zip have received your email and am working with the appropriate department in an effort to resolve your issue. Please expect a response from me in 14 business days.*

*Sincerely,*

*Mayor Jim Kenney*

---

**7 attachments**

📷 **ScreenShot of home video showing positive inspection from 1282017.png**
1.1 MB

📷 **CAR SEAT IN CAR TWO STAGES.png**
2.5 MB

📷 **Picture of food from December 2017 two.png**
946 KB

📷 **Picture of food from December 2017.png**
1 MB

📄 **Incorporation Paperwork Baby Sparkles owned by Tamiera Harris 10102016.pdf**
122 KB

📄 **Gmail - Notification of Travel for December 2017.pdf**
64 KB

📄 **Meeting Agenda 5-25-17 with NET and DHS to review remaining expectations regarding Tamia Harris permission to travel was confirmed not needed just an itenarary.**
303 KB



Exhibit B
1 of 4

## Fwd: Net cua CERTIFIED Respite Provider for Tamia Harris Requested Pickup/Drop off of Child 6th Request

1 message

**Tyeffa Harris** <tyeffaharris82@gmail.com>                    Thu, Jan 4, 2018 at 9:41 AM
To: tamieraharris@gmail.com

---

-------- Forwarded message --------
From: **Tyeffa Harris** <tyeffaharris82@gmail.com>
Date: Thu, Jan 4, 2018 at 9:40 AM
Subject: Net cua CERTIFIED Respite Provider for Tamia Harris Requested Pickup/Drop off of Child 6th Request
To: Michael Mon <Michael.Mon@phila.gov>
Cc: Ann Myers <Ann.Myers@net-centers.org>, Charise Gale <Charise.Gale@net-centers.org>, RepDriscoll@pahouse.net, Cynthia.figueroa@phila.gov

Dear Michael Mon:

My name is Tyeffa Harris and I am the Net cua certified respite provider for Tamia Harris (DOB 7-27-15) for 2 years. I understand Tamia Harris was removed from her pre adoptive mom's apartment on 12-22-2017 due to concerns on a family profile (per video I watched on reason for removal confirmed by DHS employee).

I have been politely requesting to pick Tamia up since 12-27-2017 and was told on that day when I visited net cua at 4404 north 5th street by Charise Gayle and Ann Myers that they would call me back by 5 pm on that day regarding completing a walkthrough of my home. I did not hear for them to this date and it has been 8 business days.

I have been requesting to pick up Tamia Harris and for net cua to come by my home at 4821 Unruh Avenue, phila pa 19135 to complete their walk per the standard procedure described to me in training. I was told by Cherise Gayle and Ann Myers they could no longer speak to me as of yesterday after another attempt to locate and pick up Tamia on 1/3/18 and that I had to contact you the lawyer representing them.

**Where is Tamia located? I am her certified respite provider and want to pick her up or for a social worker to drop her off to me. Why did net cua or DHS not contact Tamia's family regarding her removal 3 days before Christmas? Why was she placed with strangers when I have documented all of my attempts to get her?**

Exhibit B   2of4

Attempts to get Tamia by Tyeffa Harris Respite Provider:

1. 12/27/17

2. 12/28/17

3. 12/29/17

4. 01/02/18

5. 01/03/18

6. 01/04/17

I am concerned as I have been Tamia's respite provider for 2 years and we have a close relationship since she is my niece. I own my home and have an extra bedroom and work from home. I have experience with children as mine are school age. I have the time to care for her since I am a at home caregiver. My home also meets all requirements for emergency foster care placement. I have all my child abuse and background clearances on file with net cua since I was certified by them in April 2017.

**I believe Tamia Harris was supposed to be placed with me within 24 hours of her removal. In fact I believe net cua was to document attempts to contact me or Tamia's family within 72 hours and they have not contacted me at all or any family. I also believe that they were provided my information on 3 pm at the time of her removal by the pre adoptive mom Dr. Tamiera Harris and Miriam Colon caseworker from net cua did not contact me.**

I am requesting that Tamia Harris be released to me immediately and for net cua to come by my home to complete the walk through per their own policy for emergency family placements.

**Michael Mon If I am being denied placement of Tamia Harris with me as her certified respite provider which is on file with the court please respond within 1 business day the reason for denial with specific details on why I am being denied.**

I am reviewing my paperwork from when I was certified by net cua in April 2017 and here are my concerns about net cua and I have cc'd both Cherise and Ann for transparency. I cc'd the commissioner of dhs per recommendation Cynthia Figueroa. I have also cc'd my State Representative Michael J. Driscoll so his office is aware of how children are handled by this net cua foster care agency and dhs.

Exhibit B    3 of 4

**POLICY AND PROCEDURES NOT FOLLOWED BY NET CUA OR DHS:**

When a child has been removed from his/her home the county agency shall give first consideration of placement to relatives before other resources for placement are explored. The county agency must document that an attempt was made to place the child with a relative and if the child was not placed with a relative, document why this was not possible. When placing a child with an emergency caregiver (relative or non-relative), consideration should be given to prior or ongoing positive relationships with the child or the child's family, even if the caregiver's home is not currently an approved foster home.


Thank you,


Tyeffa Harris (certified family respite provider of tamia harris)

tyeffaharris82@gmail.com

267-904-9966

Exhibit B   4 of 4



NorthEast
Treatment
Centers

**Behavioral Health & Social Services**

## GUARDIANSHIP AGREEMENT

I, _____ Tyeffa Harris _____ , agree to accept full responsibility for

_____ Tamia Harris _____ , born on  07 / 27 / 2015 , upon the

death or incapacitation of his/her prospective adoptive parent(s)  _____ Tamiera Harris _____ .

My signing of this affidavit constitutes that I have been fully informed of extent of the above

responsibilities. I am also aware that the adoption subsidy (monies and medical assistance card) is not

transferrable. If financial support is needed then I will contact the Department of Human Services at 215-683-4347 for assistance.

Date: _____ 10-4-16 _____

Signature _____ Tyeffa Harris _____

_____ Aunt - 4-17-82 _____
Relationship/Date of Birth

Date: 10/04/2016

Witness: _____ Tamiera Harris _____

Sworn to and
Before Me This ____ day of ____ October 2016

_____ Aeesha Mosley _____
(Notary Public signature)

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
AEESHA MOSLEY
Notary Public
CITY OF PHILADELPHIA, PHILADELPHIA CNTY
My Commission Expires APR 8, 2019



6/18/2017   Screenshot_20170608-001543.png

**Jarmena Net Work...**
2159832876



9/10/15 1:30 PM

Hello coming from a placement in this rain . Running behind schedule but I'm still coming .

Ok



9/10/15 2:28 PM



6 mins Away

Ok. I have a meeting that I have set up at 255 . Just fyi



Message

  



9/21/15 2:54 PM

 Is tomorrow at 1130, 12 good to drop the gift card off

Yes that is fine 

9/21/15 2:58 PM

 Ok

9/22/15 11:51 AM

 Headed there shortly had to help Bianca with something

 Message  





**10/13/15 3:59 PM**

We're you coming today or thursday

**10/13/15 4:08 PM**

J  Hello I'm coming today at 530

Ok 

**10/19/15 4:21 PM**

 Hello I submitted the letter to CCIS from DHS on Fri.

 Message  



**Jarmena Net Work...**
2159832876



Hello coming out tomorrow for the monthly visit for safety before court. What time will you and the baby be home?  I will also pick up  the receipts  Thank you

11/2/15 10:18 AM

Ok home at 630





Ok great will be over Tue at 630

11/2/15 2:11 PM

Message

 



**Jarmena Net Work...**
2159832876

12/4/15 9:42 AM



Hi today is your last day. Best wishes in your next role. Can you forward me contact info of new worker for Tamia?

12/4/15 10:24 AM



Ccis said it could be 6 months to a year b4 I get approved for daycare services smh

12/4/15 10:27 AM

 Hello i will forward

 Message  

Ex C



**Frank**
2154352528

Sep 2 11:32 AM

 Hey just checking in to see if I can schedule a visit before you leave town or when you are home. You have court coming up and I'm going to need a safety date

 This is Frank-cua

Hi Frank, i am free today. Just have to get Tamia at 1 



Message



**Frank**
2154352528

Sep 2 1:01 PM



I got stuck here at court a little longer than expected I'll text you when I get out hopefully I can still come by

Sep 2 1:03 PM

Ok cool i will wait a little to get Tamia



Sep 2 2:04 PM



Leaving court <u>now.will</u> be there in 30

  Message   



**Frank**
2154352528



Monday would be best oct 3rd I am booked up.

Oct 3 12:03 PM



Hey its frank can I come by at 2 today?

Sure thats cool



Oct 3 2:43 PM



I'm here

Oct 14 2:46 PM



Message

 

6/10/2017



Jul 21 1:46 PM



Hey its frank are we still good for 2 today?

Jul 21 1:58 PM

Ok cool home tamia still in day care around the corner



Jul 21 1:58 PM

Ok cool home tamia still in day care around the corner



Aug 10 9:54 AM

 Message  



**Kathryn L Kiehle**
6072322049

Aug 12 1:01 PM



Hi Tamiera, it's Katie from NET. We have a visit scheduled for 2:30p. I'm going to need to push the visit up an hour or reschedule. Let me know if 3:30p work for you today instead?

Yes but having a yard sale at 4. 330 is fine



Do you need adoption packet? I get confused someone was here



 Message  



Kathryn L Kiehle
6072322049



Do you need adoption packet? I get confused someone was here from net yesterday. Frank



Ok. I'll try to make it sooner, if possible. Yes I do need the packet. I'm the Adoption worker 😊

Aug 12 2:12 PM

Ok packet is complete



Message

  



← **Kathryn L Kiehle**
6072322049    📞 ⋮

Aug 12 2:12 PM

Ok packet is complete 

Aug 12 2:53 PM

 I'm running late.... I think it's best if we reschedule. You can hold onto the paperwork. You can email everything but the clearance if you choose. I'll text you on Monday to see what your schedule looks like. Sorry, it's been a hectic week

⊕   Message      

Screenshot_20170608-002109.png



**Randy Young Net...**
2155882141



(1/2) Hello Ms Harris

My name is Randy Young, and I am ur newly assigned CM from Net.  Please give me a call or text at 215-588-2141 to hopefylly schedule a vi

(2/2) sit for this week.

Thank You

1/11/16 12:32 PM

Hi, wednesday or thursday is good





Message

  





Hi. Are you available on Monday for a visit?

Yes I work from home 



Ok i will call when i get out of court in Monday and schedule a time

Ok thanks. 

3/15/16 4:12 PM



Hello, we have some-one who can go and obtain the birth certifi-

 Message  



Randy Young Net...
2155882141

 

K

3/29/16 4:54 PM



Outside meet u at front door

K 

4/5/16 7:47 AM

Gm, Can you check to see if birth certificate came today?
Otherwise do you have lawyer info. Someone must have the original

 Message  





## Mikki Burgess
2679928180



Hi I am unable to make it today. Are you availBe on tues?

Aug 18 3:11 PM

Yes between 1 and 3





Perfect I can come at 1:30

Ok great



Aug 18 4:21 PM



Thanks

  Message    

EX C



## Mikki Burgess
### 2679928180

Aug 23 11:07 AM


Are we still good for today at 1:30?

Aug 23 11:17 AM

Yes 6601 erdrick st 19135. Available now too


Aug 23 1:38 PM


Ok thanks I'm on my way. There is traffic so it will take me another 15 min



Message     





**And when did she start?**

**September 6th** 

Sep 29 11:37 AM



**A reminder about our visit today @ 3:30p. Please confirm you will be there? Erdrick street address?**

**Yes i am home** 



**Great!**

 Message       





## Ester
2152517515



I'm calling to schedule a Home Visit for Tamia Harris since I have court for her on 12/9/16. Please respond to my voice message and text message...so I can get your availability. Thanks very much

Dec 6 11:36 AM

Hi, available all week. Please come any morning or late afternoon 6601 erdrick st 19135





Message







### Christina Johnson
2672531387

May 6 9:41 AM



Good morning I'm running 15 min late but am on my way.

May 6 9:43 AM

Good morning, Ok. 

May 6 10:30 AM



Hello, Its 10:30 am just checking to make sure you are still coming for the 10:00 am certification visit?

 Message       

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA, COUNTY,
PENNSLYVANIA

CIVIL ACTION-LAW

IN RE: TAMIA HARRIS    : No. CP-51-DP-0002109-2015

**MOTION FOR CONTEMPT OF COURT FOR PERJURY**

TO THE HONARABLE, THE JUDGES OF SAID COURT:

Petitioner Carolyn Smith Maternal Grandmother of Tamia Harris and a 16-year
employee of Pennsylvania State of the House of Representatives moves this Honorable
Court to hold NET Community Care and the Philadelphia Department of Human
Services in contempt of court for perjury on March 22, 2018.

The Supreme Court has recognized that "the power of courts to punish for contempt
and to maintain decency and dignity in their proceedings is inherent, and is as old as
courts are old. Appellate courts have noted that "a witness who seeks to conceal the
truth or to give evasive answers or to falsify or mislead the court is not acting
respectfully to the court and his conduct is reprehensible," thus subjecting the witness to
the court's inherent power to punish for contempt.

Perjury is a crime in the state of Pennsylvania and when used to cause injury to families
and a child should be punishable to the full extent. NET and DHS maliciously misled the
court stating that Tamiera Harris was not the pre- adoptive parent and therefore she
was denied the right to have a private attorney represent her for the judicial removal
hearing on March 22, 2018 (Exhibits C and D confirms adoption agreement and pre-
adoptive status registered with the court). I the maternal grandmother was a witness to
the adoption agreements and have been copied on communication emails for 2 years
and 6 months by the pre- adoptive parent. NET and DHS also further fabricated safety
complaints made below in which they were aware that the statements they made under
oath were false and committed to cover up their repeated errors with violating child
welfare laws in the State of Pennsylvania including not following administrative
procedures on child removals.

On December 22, 2017 child Tamia Harris DOB 07-27-2015 was removed from her pre-
adoptive home without a court order or due process.

On March 22, 2018 DHS testified the child was removed for safety reasons for the
following reasons referenced in Exhibit A and noted below:

a. There was no permission to take an annual holiday vacation with the child.
b. There was a business in the child's name

c. There was no "kid" food in the home
d. The child was sleeping on a "cot"
e. There was no car seat inside the home

Childline Verification Unit has reported that the safety complaints made against Dr. Tamiera Harris are unfounded verified as of July 3, 2018 (Exhibit B). Further I have evidence that DHS is currently under investigation for retaliation and failure to follow child welfare laws in the state of Pennsylvania taking this child Tamia Harris from her pre- adoptive Mom after she filed a grievance against them for performance issues, delays with the adoption and failure to follow administrative procedures back in August 2017.

1. I am in possession of legally obtained audio and video which confirms that NET and DHS fabricated a safety complaint and maliciously committed perjury in court on March 22, 2018. I would like permission to share this video in court.
2. I am in possession of the NET signed home inspection report from December 8, 2017 which confirms both child and home was confirmed safe by caseworkers and there was plenty of food in the home and they maliciously concealed this evidence from the court and fabricated a safety complaint that did not exist (Exhibit H).
3. I am in possession of written emails in which NET Community Care confirmed permission for Tamiera Harris to travel on multiple occasions for vacation yet they committed perjury on March 22, 2018 stating they were not aware of her travel plans and did not give permission to travel on a vacation (Exhibit E).
4. I am in possession of documents from the State of Pennsylvania which confirm the business that these unlicensed caseworkers from NET and DHS thought was in a child's name is not and that NET was aware of this since December 2016 as they personally documented this statement in the approved family profile that they authored (Exhibits F and G).
5. I am in possession of pictures of my grandchild in her bed and car seat from November 2017 (Exhibits I and J) just a month before she was removed and in possession of video and email that confirms NET was aware that these items were available and they maliciously committed perjury despite the overwhelming evidence that no safety issues ever existed.

Wherefore, Petitioner requests this Honorable Court to hold NET and DHS in contempt for perjury. The safety complaint was maliciously fabricated, wasted the courts time, and was not in the best interest of the child who has been alienated from her forever family and shuffled to two non-family foster care homes when she has an established family where she resided since birth for two years. The child was happy, healthy, safe and thriving in a loving environment where she was nurtured, loved and developing appropriately before NET and DHS unwarranted and baseless removal.

Respectfully Submitted,

Carolyn Smith, 7-17-2018

Ex D

*Attachments:*

*Exhibit A: Court Transcript Highlighting Perjured Statements Pages 33-40*
*Exhibit B: Child Abuse Clearance Record shows Unfounded*
*Exhibit C: Original Adoption Placement Agreement*
*Exhibit D: Court Document Confirms Pre-Adoptive Status*
*Exhibit E: Written Email confirms Travel Notification and Subsequent Acknowledgement*
*Exhibit F: State Document Verifying Business Name*
*Exhibit G: Family Profile Confirms NET aware of Business Details Page 8*
*Exhibit H: NET Home Inspection Report from 12-5-2017 confirms no safety issues*
*Exhibit I: Child Pictured in Toddler Bed November 2017*
*Exhibit J: Child Pictured in Car Seat November 2017*

## <u>VERIFICATION</u>

I, Carolyn Smith, Petitioner in the within action, state that the facts set for the foregoing Petition are correct, and accurate to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S.A., Section 4904, relating to unsworn falsification to authorities.

Date: _7-17-18_

_Carolyn Smith_

Carolyn Smith, Petitioner

## Certificate of Service

I hereby certify that I have this day served a true copy of the foregoing document upon the parties, listed below, in accordance with the requirements of §1.54 (relating to service by a party) via first class mail.

Michael Mon, Esquire
1515 Arch Street, 16th Floor
Philadelphia PA 19102

Andre Martino Esquire
7435 Sprague Street
Philadelphia, PA 19119

Tamiera Harris
712 Waterview Lane
Philadelphia, PA 19154

Tyeffa Harris
4821 Unruh Avenue
Philadelphia PA 19135

Bianca Smith
1910 N. Taylor Street
Philadelphia PA 19121

Date: 2-17-18

_Carolyn Smith_

Carolyn Smith, Petitioner

[1]  MR. DICKSON: The concerns were not
[2] having a car seat at the time. When she came out
[3] the second time. The baby's bed. You know,
[4] there was a -- something about her having a --
[5] her saying that she had a six -- a year lease
[6] when she actually had like a six-month lease.
[7]  Which at the time the writer just was
[8] worried about Doctor Harris being honest with
[9] her. Not so much as it was six-month lease or if
[10] it was year lease, but just be honest with her.
[11] Something about the business that she has. She
[12] was reporting to the profile writers. So --
[13]  THE COURT: what do you mean by
[14] businesses that she had?
[15]  MR. DICKSON: I guess she has like
[16] various business'. She has a business -- it was
[17] alleged that she -- it was reported that a
[18] building in the baby's name. And, some other
[19] business that she had that she didn't inform the
[20] profile writer of.
[21]  THE COURT: All right. Was there any
[22] concerns about the baby? The safety of the baby.
[23]  MR. DICKSON: Yes. For Someone who's
[24] about to consent to get a baby was that -- how is
[25] the baby being transported with no car seat. She

[1]  I think told the profile write she was used an
[2] uber. But, at the same time, she still needs the
[3] car seat to transport the baby.
[4]  THE COURT: And, did Mrs. Harris
[5] explain why she went out of state with the baby?
[6]  MR. DICKSON: No, I didn't get a chance
[7] to ask her that.
[8]  THE COURT: All right. Ms. Colon, did
[9] you ask her that eventually?
[10]  THE COURT: So, no I was not able to
[11] speak with her because at that time they both --
[12] both officers came back out with Mr. Dickson.
[13] Did not want to remove the child. I then did
[14] speak -- I asked the officer's if I could speak
[15] with them. They said yes.
[16]  And, I explained. They kept going back
[17] to an order that -- where Doctor was given TPC.
[18] And, we were waiting for a PLC -- unsubsidized
[19] PLC. And, they kept looking at that order.
[20]  I did explain to them that the child
[21] was recommitted to DHS. And, that she had -- she
[22] was reinstated to full -- to move forward with
[23] kinship. Therefore, the child was still
[24] committed. Was additionally committed to DHS.
[25] And that the home was inadequate.

[1]  Which they posed arrest. And, I also
[2] stated that she was also a flight risk. They
[3] asked me how was that so. And, I explained that
[4] because I tried to see the child before that she
[5] told me was in Florida.
[6]  I did not know she was in Florida. At
[7] that time, the officer did turn around and said,
[8] yes we can remove the child now. And, we all
[9] walked into the home. When we walked back into
[10] the home -- did you have a question?
[11]  THE COURT: I was going to ask you how
[12] many times did you try to see safety for the
[13] child and you were unable to do so?
[14]  MS. COLON: I'm sorry?
[15]  THE COURT: How many times did you try
[16] to seek safety for the child, and you were unable
[17] to see the child?
[18]  MS. COLON: To see the child?
[19]  THE COURT: Yeah.
[20]  MS. COLON: That -- that month?
[21]  THE COURT: Yes.
[22]  MS. COLON: After we received that,
[23] twice.
[24]  THE COURT: And, for two times you went
[25] out to visit?

[1]  MS. COLON: The second time I was.
[2] When I was able to see the child.
[3]  THE COURT: That was on the 22nd?
[4]  MS. COLON: Correct.
[5]  THE COURT: Okay. All right. So, you
[6] went in and removed the child that day?
[7]  MS. COLON: We went back in, yes. And,
[8] the officer was able to grab the child. Give the
[9] child to me. I walked into her bedroom, and I
[10] put a coat on her/put shoes on her. And then,
[11] when we were walking back out Doctor Harris was
[12] filming us. And then, the officer told me just
[13] to leave with the child. So, I walked out of the
[14] home with the child at that time.
[15]  THE COURT: Okay. Mr. Mon, any other
[16] questions?
[17]  MR. MON: Not for this witness.
[18]  THE COURT: What other witness do you
[19] have?
[20]  MR. MON: I have the profile writer, I
[21] have the supervisor, and I have Mr. Dickson.
[22]  THE COURT: Which one you calling?
[23]  MR. MON: I'll call Mr. Dickson first.
[24]  THE COURT: Okay.
[25]  MR. MON: Okay. All right.

[1]      THE COURT:  Well, Mr. Dickson's
[2]  already spoke.  Like do you have any additional
[3]  questions for him?
[4]      MR. MON:  Yes.  Okay.  So, Mr. Dickson
[5]  -- so, you are the permanency work on this case?
[6]      MR. DICKSON:  Yes.
[7]      MR. MON:  And, what does the permanency
[8]  worker do on an adoption case?
[9]      MR. DICKSON:  The permanency worker
[10]  pretty much gets the child recruitment started
[11]  for the child.  Also, at times, I identify
[12]  pre-adoptive resources for the child to go into
[13]  the home to get adopted.  Focusses on making sure
[14]  the profile -- family and child profiles are
[15]  complete.  We'll sign consents as the legal
[16]  guardian for the child.
[17]      MR. MON:  Okay.  So, in this matter,
[18]  there was an agency assigned to write the family
[19]  profile, right?
[20]      MR. DICKSON:  Right.
[21]      MR. MON:  Okay.  And, once that profile
[22]  is turned over to you, you then either approve it
[23]  or disapprove it?  Right?
[24]      MR. DICKSON:  Right.
[25]      MR. MON:  And then, you provide a

[1]  consent to adopt, right?
[2]      MR. DICKSON:  Right.
[3]      MR. MON:  Okay.  In this instance, did
[4]  you ever receive an approved profile from The
[5]  Agency?
[6]      MR. DICKSON:  There was a -- there was
[7]  a approved profile from The Agency back in, I
[8]  want to say -- I don't remember.  Like
[9]  sometime -- let me just -- 2017.
[10]      MR. MON:  Right.  That was for the --
[11]  for when the child was previously in Ms. Harris'
[12]  home.  Right?
[13]      MR. DICKSON:  Right.
[14]      MR. MON:  So, once the child was
[15]  replaced with her we had to do another profile,
[16]  right?  It would not be the (unintelligible)
[17]  profile?
[18]      MR. DICKSON:  Right.  And, she had to
[19]  do a medical eval because she had moved.  And so,
[20]  they needed to access her new home.
[21]      MR. MON:  And, in this case, DHs
[22]  was -- was DHS going to approve this profile or
[23]  consent to the adoption?
[24]      MR. DICKSON:  Not with the profile
[25]  writer's concern, no.

[1]      MR. MON:  Okay.  And, at this point,
[2]  is DHS willing to consent to have Ms. Harris
[3]  adopt this child?
[4]      MR. DICKSON:  No.
[5]      MR. MON:  Okay.  What are your reasons
[6]  for not consenting to an adoption by Ms. Harris?
[7]      MR. DICKSON:  Because she's not
[8]  cooperating with the adoption process.
[9]      MR. MON:  Okay.  What do you mean by
[10]  that?
[11]      MR. DICKSON:  I mean that -- like the
[12]  profile writers concern.  She's not being an
[13]  upcoming -- forth, upcoming, and honest with the
[14]  profile writer as far as like providing things.
[15]  She's providing the bed.  Proving that she had a
[16]  bed basically for the profile writer.  Not going
[17]  out of town.  Going out of town without informing
[18]  anyone from DHS or CUA.
[19]      MR. MON:  Okay.  And, so getting on the
[20]  -- taking the child out of state.  There were at
[21]  least two meeting held with DHS, CUA, and MS.
[22]  Harris regarding what, the ability to take the
[23]  child out of state correct?
[24]      MR. DICKSON:  Correct.
[25]      MR. MON:  Okay.  And, in those

[1]  meetings, did Ms. Harris indicate she would
[2]  follow the rules and regulations of DHS?
[3]      MR. DICKSON:  Yes, she did.
[4]      MR. MON:  Okay.  And, what happened
[5]  subsequent to that?
[6]      MR. DICKSON:  She did -- she still
[7]  ended up going out of town with the child.
[8]      MR. MON:  Okay.  Why is that a concern
[9]  to DHS?
[10]      MR. DICKSON:  Because we've --
[11]  that's -- that -- that child is in our custody.
[12]  So, we need to know the whereabouts of that child
[13]  at all times.
[14]      MR. MON:  Okay.  And, you did -- do you
[15]  also need to know where the child was going?
[16]      MR. DICKSON:  Correct.
[17]      MR. MON:  Do you need to not -- have
[18]  information of where -- how you can locate the
[19]  child?
[20]      MR. DICKSON:  Yes.
[21]      MR. MON:  Okay.  All right.  Where
[22]  there any other concerns?
[23]      MR. DICKSON:  There was like a business
[24]  that's supposed to be in the bay's name.  So, she
[25]  has like the child on social media.  Like her



# PENNSYLVANIA CHILD ABUSE HISTORY CERTIFICATION

TAMIERA S. HARRIS
712 WATERVIEW LN
PHILADELPHIA, PA 19154

CERTIFICATION ID: VA0UC9ENCN

CERTIFICATION PURPOSE: ADOPTION

VERIFICATION DATE: 7/3/2018

SOCIAL SECURITY #: XXX-XX-7988

DATE OF BIRTH: 4/6/1984

The above named person has applied for a Pennsylvania Child Abuse History Certification pursuant to 23 Pa. C.S., Chapter 63 related to the Child Protective Services Law. NO RECORDS EXIST in the Pennsylvania Department of Human Services' Statewide database listing TAMIERA S. HARRIS as a perpetrator of an Indicated or Founded report of child abuse.

Applicants are required to show the Administrator the results of their Child Abuse History Certification. Administrators are required to keep a copy of this Child Abuse History Certification on file. Any person altering the contents of this document may be subject to civil, criminal or administrative action.

*ISSUED BY*    Commonwealth of Pennsylvania
Department of Human Services
CHILDLINE AND ABUSE REGISTRY
ChildLine Verification Unit
P.O. Box 8170
Harrisburg, PA 17105-8170
1-877-371-5422

**ANY ALTERATION OR ERASURE VOIDS THIS DOCUMENT**



046390

CY893O - 6/00

Ex D



## pennsylvania
DEPARTMENT OF HUMAN SERVICES

TAMIERA S HARRIS
712 WATERVIEW LANE
PHILADELPHIA, PA 19154

SSN:
TCN:   2372764035

Your Federal Bureau of Investigation (FBI) fingerprint based record check has been processed in accordance with Public Law 92-544 and the Child Protective Services Law (Title 23, Pa C.S. Chapter 63). **The following is the result of your federal criminal history background check as of** 06/05/2018.

[X] **NO RECORD EXISTS**

[ ] **RECORD EXISTS**, but conviction(s) **does not prohibit hire** in a childcare position according to the Child Protective Services Law.

[ ] **RECORD EXISTS**, but no conviction(s) is shown. This **does not prohibit hire** in a childcare position according to the Child Protective Services Law.

[ ] **DISQUALIFICATION** – Record exists and contains a conviction(s) that is grounds for denying employment in a childcare position according to the Child Protective Services Law.

If you are questioning the accuracy of this response, please submit court documents to support your position. You may request a copy of your record from five years following receipt of verification by making a written request to the address listed above. Applicants are encouraged to provide this verification to the prospective employer immediately upon receipt.

Sincerely,

*Christina E. Phillips*

Christina Phillips, Bureau Director
Bureau of Policy, Programs and Operations

Office of Children, Youth and Families
ChildLine and Abuse Registry | Criminal Verification Unit
PO Box 8053 | Harrisburg, PA 17105-8053 | P 1.877.371.5422 | F 717.772.6533 | www.dhs.state.pa.us

September 30, 2015

**Consent to adoption and Voluntary relinquish parental rights of Child Tamia Harris to Tamiera Harris**

I Bianca Smith DOB 12-25-1990 birth mother of Tamia Harris born at Temple University in Philadelphia Pennsylvania DOB 7-27-2015 voluntarily relinquish my parental rights to my cousin Tamiera Harris DOB 04-06-1984 and I am giving her consent to adopt Tamia Harris. I am doing this in the best interest of Tamia since I believe Tamiera is best fit to care for Tamia physically, mentally and spiritually. I work full time and I am taking care of two small children who are autistic. I believe Tamiera will still allow me and my children to bond together as a family and in the event she is unable to care for Tamia I have also identified a backup family guardian my cousin named Tyeffa Harris DOB 04-17-1982. Tyeffa Harris will baby sit Tamia and has agreed to take on the Guardian role as a backup if Tamiera is not able to do so.

I believe it is the best interest to keep Tamia connected in our family and even though this is a tough decision I am confident that Tamiera will be the best mom to Tamia and will make the best effort to maintain contact with Tamia's siblings. Tamiera is financially stable, has a home, has a doctorate, MBA and attended Villanova University. She is established in her career as a Clinical Project Manager. Tamiera is a Christian woman, attends Christ Temple on 307 West Tabor Road and has experience raising children since she helped raise her nieces and nephews for several years. Tamiera will give Tamia a great life and learning experiences based on her being a mentor to me helping me get through high school and into college. I am proud to give consent to Tamiera Harris to adopt Tamia Harris and these are my wishes and I hope Tamia will be proud of the decision I made someday. Tamiera has acted as the preadoptive mom since taking Tamia home from the hospital and I believe the transition will be smooth. DHS has supported Tamiera in transitioning Tamia from the hospital to her home at 9534 Clark Street, Philadelphia PA 19115 and has visited Tamia to ensure she was healthy and safe in her new home. DHS have confirmed that they will assist Tamiera with the adoption to ensure this is a smooth process and I will sign off to ensure my cousin is free to adopt Tamia so she will remain connected with my family. Today I have witnessed this in front of my mom Carolyn Smith and Cousin Tyeffa and Tamiera Harris.

Thank you, *Bianca Smith*  9/30/2015

Bianca Smith (Birth Mom of Tamia Harris)
Executed at my home 3633 N Camac Street, Philadelphia PA 19140 per guidelines instructed by DHS

**Witness 1:** Carolyn Smith (Mother of Bianca Smith), Address 3633 N Camac Street, Philadelphia PA 9140
*Carolyn Smith*  9/30/2015

**Witness 2:** Tyeffa Harris (Cousin of Bianca Smith), 4821 Unruh Avenue, Philadelphia PA 19135
*Tyeffa Harris* 9/30/2015

**Witness 3:** Tamiera Harris (Cousin of Bianca Smith), Address 9534 Clark Street, Philadelphia PA 19115

*T H*  9/30/2015

Commonwealth of Pennsylvania

In the Interest Of:

Tamia Harris, A Minor
Date of Birth: 07/27/2015

IN THE FAMILY COURT OF PHILADELPHIA COUNTY, PENNSYLVANIA

JUVENILE DIVISION

| DOCKET NO: | CP-51-DP-0002109-2015 |
| FID: | 51-FN-001752-2015 |

# PERMANENCY REVIEW ORDER

### Attendance

| Attendee Name | Attendee Role | Attendance Type |
|---|---|---|
| Harris, Tamia | Child | Did Not Attend |
| Martino, Andre | Attorney for Child (Harris, Tamia) | In Person |

**PERSONS APPEARING AT HEARING**

The following persons appeared at this hearing:    DCR LO, M. Mon ACS, T. Bronson DHS Rep, A. Martino GAL(P), CUA Supervisor, Truancy, DHS Adoptions, Foster Parent

AND NOW, this 28th day of November, 2017, the court finds:

**CONTINUING PLACEMENT - Necessity and Appropriateness**

The placement of the child continues to be necessary and appropriate.

**PERMANENCY PLAN - Reasonable efforts to finalize**

Reasonable efforts have been made by the Philadelphia Department of Human Services ('Agency') to finalize this child's permanency plan.

**CURRENT PERMANENT PLACEMENT GOAL**

The current placement goal for the child is Adoption.

**CURRENT PLACEMENT - Child's Safety**

The child is safe in the current placement setting. Safety as of 11/16/2017

**ORDER OF COURT - On the basis of the above findings, IT IS HEREBY ORDERED THAT:**

Legal Custody of the Child shall remain with the Philadelphia Department of Human Services.

Placement of the Child shall remain in Pre-Adoptive Foster Care (Kinship) through NET.  The Child's placement is the least restrictive placement that meets the needs of the child and there is no less restrictive alternative available, in that child with Maternal Cousin

**FINDINGS/ORDERS**

THE COURT FURTHER FINDS:   Child is up to date with medical and dental.
Foster Parent has been compliant with services.
THE COURT FURTHER ORDERS:   Remain committed and placed.
Foster parent to remain compliant with CUA/DHS.

**NEXT SCHEDULED COURT DATE(S)**

Next Scheduled Court Date: - AARC Permanency Review - 02/20/2018 - 9:30AM - 1501 Arch Street - Courtroom 4D - Judge Jonathan Q. Irvine

CP-51-DP-0002109-2015

In The Interest Of:  Tamia Harris, A Minor

Such disposition having been determined to be best suited to the protection and physical, mental and moral welfare of the child.

BY THE COURT:

_Judge Jonathan Q. Irvine_

Judge Jonathan Q. Irvine

Copies To:  M. Mon ACS, T. Bronson DHS Rep, A. Martino GAL(P), CUA Superviser, Truancy, DHS Adoptions Foster Parent

Commonwealth of Pennsylvania

In the Interest Of:

Tamia Harris, A Minor
Date of Birth: 07/27/2015

IN THE FAMILY COURT OF PHILADELPHIA COUNTY, PENNSYLVANIA

JUVENILE DIVISION

DOCKET NO:   CP-51-DP-0002109-2015
FID:   51-FN-001752-2015

## Custody Decree

**And Now**, this 18th day of July, 2017, it hereby **Ordered** and **Decreed** that:

Name: Tamiera Harris
Address: 9534 Clark Street, Philadelphia, PA 19115

is/are awarded temporary physical custody of the above named child.

BY THE COURT:

_____
Judge Jonathan Q. Irvine

Exhibit D

 Gmail                                        Tamiera Harris <tamiera.harris@gmail.com>

## Things still needed

**Tamiera Harris** <tamiera.harris@gmail.com>                          Mon, Dec 11, 2017 at 7:28 PM
To: Caterina Gallelli <Caterina.Gallelli@net-centers.org>
Cc: Tiffany Vann <Tiffany.Vann@net-centers.org>, Kenneth A Dixon <Kenneth.A.Dixon@phila.gov>, Charise Gale
<Charise.Gale@net-centers.org>, Steven Grilli <Steven.Grilli@net-centers.org>, Angela D Jordan
<Angela.D.Jordan@phila.gov>

Hi Ms. Gallelli,

All documents have been sent to you. Can you confirm when you will have an electronic version of the family and child
profile available for me to view? Also I know you and Ms. Vann came out for December and saw Tamia however please
be sure to have someone complete the routine safety visit for December. Tamia and I will be home most of the day
Thursday and Friday as we will be preparing for our vacation. Please note upcoming holiday vacation schedule from 12-
16-2017 to January 2, 2017. We will be traveling locally throughout Philadelphia and surrounding areas plus driving to
stay in Orlando Florida from 12-16-207 to 12-22-2017 at the Westgate Resorts & Spa 9500 Turkey Lake Road Orlando,
FL 32819 with Tamia and my mother Angenette Sanders.

Thank you!

On Mon, Dec 11, 2017 at 2:43 PM, Caterina Gallelli <Caterina.Gallelli@net-centers.org> wrote:
Hello Dr. Harris,

I hope you had a great weekend.  I wanted to remind you from our visit on friday the items still needed for the family
profile:

- Renters Insurance Sent expires November 1, 2018
- Car Insurance Sent expires l June 17, 2018
- Copy of your Lease Sent Electronic Lease Agreement on 12-11-2017
- Document from Bank showing that you paid off your rent for the year. Sent Bank Confirmation on 12-11-2017

Thank you in advance. Please email the documents or let me know if you would like me to pick them up, and I will set
up a day to come to your home.

Caterina Gallelli, MPH
Permanency Supervisor

EXHIBIT E

M Gmail

Tamiera Harris <tamiera.harris@gmail.com>

Leonard

**Tamiera Harris** <tamiera.harris@gmail.com>                                    Wed, Dec 20, 2017 at 11:25 AM
To: Miriam Colon <Miriam.Colon@net-centers.org>
Cc: Ann Myers <Ann.Myers@net-centers.org>, Charise Gale <Charise.Gale@net-centers.org>,
"Kenneth.A.Dixon@phila.gov" <Kenneth.A.Dixon@phila.gov>

Ok see you then.

Thanks!

On Wed, Dec 20, 2017, 10:11 AM Miriam Colon <Miriam.Colon@net-centers.org> wrote:
   Good morning. Friday will be good, 1pm. Thank you.

   *Sent from my Verizon 4G LTE Droid*
   On Dec 19, 2017 5:48 PM, Tamiera Harris <tamiera.harris@gmail.com> wrote:
   Hi Ms. Colon,

   I am on vacation. You can stop by Friday afternoon or next Thursday afternoon. Please confirm. This is the holiday
   season and we have many holiday activities.


   Thanks

   On Dec 19, 2017 5:02 PM, "Miriam Colon" <Miriam.Colon@net-centers.org> wrote:
      Hello Dr. Harris,

      I am reaching out to see if you are available tomorrow or Thursday for a visit.  Let me know.

      Thank you and have a great day.


      *Miriam J. Colón, MHS*

      NET CUA-1 Bi-lingual Case Manager

      Office: 267-339-0528 Cell: 267-253-3586

      4404 N. 5th St. Philadelphia PA 19140


      **Confidentiality Statement**

      This email and any files transmitted with it are confidential and intended solely for the use of
      the individual or entity to whom they are addressed.  Please notify the sender immediately if
      you have received this e-mail in error, and delete this e-mail from your system.  If you are not
      the intended recipient, you are notified that disclosing, copying, distributing, or taking any
      action in reliance on the contents of this information is strictly prohibited.

Ex D

**PENNSYLVANIA DEPARTMENT OF STATE**
**BUREAU OF CORPORATIONS AND CHARITABLE ORGANIZATIONS**

| Docketing Statement – New Entity<br>DSCB: 15-134A<br>(rev. 7/2015) | <br>134A |
|---|---|

1. **Entity Name:**

   Baby Sparkles LLC

In the case of a foreign association which must use an alternate name to register to do business in Pennsylvania, the alternate name should be given.

2. **Tax Responsible Party**

   Name of individual responsible for initial tax reports :     Tamiera S Harris

   6601 Erdrick Street , Philadelphia , Philadelphia , PA , United States , 19135

| Number and Street | City | State | Zip | County |
|---|---|---|---|---|

3. **Description of Business Activity:**

   Baby Sparkles Biz provides clothing, shoes, accessories, books, dolls and toys.

4. **FEIN [Employer Identification Number/Federal Tax Identification Number]:**

   81-4244685

FEIN enables agencies to confirm that Commonwealth accounts are properly matched and that this request is processed without added delay. If the business entity does not currently have an FEIN, it can get a FEIN immediately by applying online at irs.gov at the following page http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Employer-ID-Numbers-EINs.

*Ex D*

**PENNSYLVANIA DEPARTMENT OF STATE**
**BUREAU OF CORPORATIONS AND CHARITABLE ORGANIZATIONS**

## Certificate of Organization Domestic Limited Liability Company
(15 Pa.C.S. § 8913)

| Name | | |
|---|---|---|
| tamiera s harris | | |
| **Address** | | |
| 6601 erdrick street, | | |
| **City** | **State** | **Zip Code** |
| philadelphia | PA | 19135 |

Document will be returned to the name and address you enter to the left.

**Fee: $125.00**

In compliance with the requirements of 15 Pa.C.S. § 8913 (relating to certificate of organization), the undersigned desiring to organize a limited liability company, hereby certifies that:

1. The name of the limited liability company (designator is required, i.e., "company", "limited" or "limited liability company" or abbreviation):

   **Baby Sparkles LLC**

2. The (a) address of the limited liability company's initial registered office in this Commonwealth or (b) name of its commercial registered office provider and the county of venue is:

| (a) Number and Street | City | State | Zip | County |
|---|---|---|---|---|
| 6601 Erdrick Street | Philadelphia | PA | 19135 | Philadelphia |

   (b) Name of Commercial Registered Office Provider                                County

   c/o:

3. The name and address, including street and number, if any, of each organizer is (all organizers must sign on page 2):

| Name | Address |
|---|---|
| Tamiera S Harris | 6601 Erdrick Street , Philadelphia , Philadelphia , PA , United States , 19135 |

4. *Strike out if inapplicable term*

   ~~A member's interest in the company is to be evidenced by a certificate of membership interest.~~

**PENN File: October 9, 2016**

DSCB: 15-8913-2

5. *Strike out if inapplicable term*

~~Management of the company is vested in a manager or managers.~~

6. The specified effective date, if any is: (month date year hour, if any)

10/10/2016 8:00 AM                    .

month    date    year    hour, if any

7. *Strike out if inapplicable:* ~~The company is a restricted professional company organized to render the following restricted professional service(s):~~

8. For additional provisions of the certificate, if any, attach an 8½ x 11 sheet.

IN TESTIMONY WHEREOF, the organizer(s) has (have) signed this Certificate of Organization this

09      day of  October    ,  2016   .

Tamiera S Harris
**Signature**

Tamiera has considered the possibility of adding another foster child to her family in the future. She may be open her home to a young boy or girl within a year or two. If this does occur, she will plan and accommodate for the individuals needs of Tamia and the other child.

## XII.   Community

Tamiera resides in the Tacony section of Philadelphia; this is an urban environment. She considers her neighborhood to be safe. Tamiera reports that the community is able to meet all of Tamia's cultural and social needs.

In regard to meeting Tamia's educational needs when she is of school-age, Tamiera will enroll her in the local public school, Anne Franklin Elementary. She reports that the school is a great public school. Tamiera has researched the school and stated that it will be able to meet all of Tamia's needs; the school was rated an 8 out of 10. Tamiera seems to be well informed of the school and Tamia's educational plan. Tamiera will enroll Tamia in Anne Franklin Elementary when she turns four, as the school has pre-Kindergarten.

There are a variety of community activities that can provide social and cultural needs of the child in the home. There are shopping centers as well as recreational areas within a short distance of the home. There are two parks nearby the residence. There is also a playground in the community. There are multiple shopping centers within a mile of the home.

## XIII.   Resources

Tamiera is employed full-time with PRA Health Science as a Senior Clinical Project Manager. Tamiera receives ████████ per month from her employer.

Tamiera also owns a business/brand, BabySparkles.biz, which she created for Tamia. Tamiera's website sells an African American baby doll, accessories, and a book "Baby Sparkles Goes to Church" (that she wrote). The brands "mission is to educate and empower children to dream big, and to embrace their culture and spirituality through sharing stories, kindness and elegance to anyone they encounter." (*babysparkles.biz, 2015*) Tamiera does not have a 1099 for 2015 as the company is still in the launch phase. There is no income statement available either. This information will not be available until after December 31, 2016.

Additionally, Tamiera is the founder of her own non-profit company, Black Career Coach. She offers the following services: career coaching, resume writing, cover letters, resume distribution, job search strategies, recommendation services, salary negotiation guides, and thank you letters. Their

Exhibit ___ D Home Inpection Screenshot from Home Video Date Stamped by Google December 8, 2017 Confirms Home Condition was Good and Food was Checked off as Adequate by NET Caseworker



Exhibit __D__ Picture of Child In Carseat at 2 year old inside Apellant T.H. Car



**Exhibit** ___ **Picture of Refrigerator at 712 Waterview date stamped by Google two days prior to the removal.**





EXHIBIT D

Add a description



## April 27, 2017
Thursday 8:27 PM



## /storage/emulated/0/DCIM/Restored/20170427_202733.mp4
2.1MP   1920 x 1080   16 MB

LOCATION



*Exhibit D*

3/23/2018                                    Account

DaVinci Twilight 6" Ultra-Firm Deluxe
Crib Mattress

**$58.90**

Eligible for return until **Thu, Nov 5**

---

## 🚚 Delivered

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**FedEx #637015092199**



Nerina Window Curtain

Qty: 2

**$67.62**

$33.81/ea

Eligible for return until **Tue, Nov 3**

---

## 🚚 Delivered

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**FedEx SmartPost #9261299994727525504492**



WallPops Patchwork Daisy Dot Decals

Qty: 6

**$59.70**

$9.95/ea

Eligible for return until **Fri, Nov 6**

---

## 🚚 Arrives by Wed, Aug 12

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**UPS Mail Innovations #9274890000772725737846**

2 of 4



3/23/2018                                            Account

WallPops Forget Me Not Frame Decals

**$9.80**



# 🗔 Picked up

**Walmart Philadelphia**
9745 Roosevelt Blvd Ste A, Philadelphia, PA 19114
**Pickup person:** tamiera harris (267) 304-8787

Storkcraft Princess 4-in-1 Fixed-Side
Convertible Crib, White

**$249.10**

Eligible for return until Fri, Nov 13

## Order summary

| | |
|---|---|
| Subtotal | $502.90 |
| Shipping & surcharges | FREE |
| Pickup | FREE |
| Tax | $40.24 |
| **Order total** | **$543.14** |

## Payment method

VISA Ending in **2826**

## Billing address

tamiera harris

9534 clark street

Philadelphia, PA 19115

Exhibit D

3/23/2018

Account

Get $10 cash back on this purchase!

Just for trying Shop **SMARTER**
*Advertiser partner offer


Online order

# July 31, 2015

Order #4831561-438341

## 🚚 Delivered

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**FedEx #207902071311799**



Leachco - Cuddle-U Basic Nursing
Pillow and More, Pink Dots

$**22.79**

Eligible for return until **Thu, Feb 23**

## 🚚 Delivered

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**FedEx #207902071311829**



Delta - 48-Piece Nursery Storage Set,
Choose Your Color

$**34.99**

Eligible for return until **Thu, Feb 23**

## 🚚 Delivered

**tamiera harris**

9534 clark street, Philadelphia, PA 19115

**FedEx #266399018319322**

1 of 4





| | | |
|---|---|---|
| subtotal (8 items) | $269.47 | |
| delivery | free | |
| tax | $0.00 | |
| | $269.47 | |

# ordered August 29, 2015

account / orders / #102649386650

1 of 3

shipment

payment

VISA Visa '''     $269.47

delivered on
## Wed, Sep 2

delivered to
tamiera harris
9534 Clark St
Philadelphia, PA 19115

**White Ceramic Letter Dish - T**
qty 1   $8.90

returns & receipts   write review

report an issue

**White Ceramic Letter Dish - A**
qty 2   $17.80

returns & receipts   write review

Exhibit D



**shipment**

subtotal (8 items)   $269.47
delivery             free
tax                  $0.00
                     $269.47

**payment**

VISA Visa ***   $269.47

2 of 3

delivered on
**Fri, Sep 4**

delivered to
tamera's address
address is not displayed to protect guest privacy

**Graco® Verb Click Connect Travel System - Azalea**

tamera's
qty 1    $179.99

returns & receipts   write review

report an issue

**Circo™ Ruffled Crib Skirt - White**

tamera's
qty 1    $24.99

returns & receipts   write review

report an issue

**shipment**

3 of 3

delivered on
**Thu, Sep 3**

*Exhibit*

# Harris Meeting Agenda
## 5-25-17

The purpose of this meeting is to ensure agreement of return of Tamia Harris to Dr. Harris care.  We will review the following items:

- Expectations to continue with the adoption process.
- Expectations about travel with Tamia (Act 75).
- Expectations about respite.
- Expectations about monthly visits with professionals.
- Concerns, issues, questions, and/or requests

These topics will not be discussed in any particular order; however concerns, issues, questions, and/or requests will be addressed at the end so please make notes.

Notes:

- Final home inspection needs to be scheduled by NET
- Tamiera has completed all steps for adoption
- Tamiera has permission to travel out of State with Tamia but must provide dates and location in advance via email.
- monthly visits will be condesend
- Tyeffa Harris is certified Respite and Tyeffa is the back up guardian
- Child advocate must confirm his approval

Mail - Docucare Copy Service - Outlook

11/19/2019

CERTIFICATE OF COMPLETION

*Tamiera Harris*

FOR COMPLETION OF THE FOLLOWING PRE-SERVICE TRAINING:

## ACT 75: Reasonable and Prudent Parenting

Date: 04/24/2017          3 Hour

Christina Johnson, M.S.
Director of Placement Services

# ACTIVITIES AND EXPERIENCES FOR CHILDREN IN OUT-OF-HOME PLACEMENTS ACT - ENACTMENT

## Act of Dec. 10, 2015, P.L. 440, No. 75          Cl. 67

### An Act

Providing for activities and experiences for children in out-of-home placements.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Section 1.  Short title.
This act shall be known and may be cited as the Activities and Experiences for Children in Out-of-Home Placements Act.
Section 2.  Legislative intent.
The General Assembly finds and declares as follows:
(1)  Parents and guardians make important decisions every day regarding the participation of their children in activities. Caregivers of children in out-of-home placements are faced with making the same decisions for children in their care.
(2)  When a caregiver of a child in an out-of-home placement makes a decision regarding the child's participation in an activity, the caregiver must consider applicable laws and policies designed to safeguard the child's health and safety. However, these laws and policies are sometimes interpreted to prohibit a child from participating in age-appropriate or developmentally appropriate extracurricular and community activities that are important to healthy child and adolescent development.
(3)  Participation in activities in school and the community is important to a child's well-being, both emotionally and in terms of developing valuable life skills and building healthy supportive relationships with peers and caring adults. Providing children with age-appropriate or developmentally appropriate opportunities to experience freedom and responsibility are central to making a successful transition to adulthood.
(4)  It is the intent of the General Assembly to recognize the importance of normalizing the lives of children in out-of-home placements and to empower their caregivers to approve or disapprove a child's participation in activities without prior approval of the department, the child's county agency or private agency caseworker or the court.
Section 3.  Definitions.
The following words and phrases when used in this act shall have the meanings given to them in this section unless the context clearly indicates otherwise:
"Age-appropriate or developmentally appropriate."  The following:
(1)  activities or items that are generally accepted as suitable for children of the same chronological age or level of maturity or that are determined to be developmentally appropriate for a child, based on the development of cognitive, emotional, physical and behavioral capacities that are typical for an age or age group; and
(2)  in the case of a specific child, activities or items that are suitable for the child based on the developmental stages attained by the child with respect to the cognitive, emotional, physical and behavioral capacities of the child.
"Caregiver."  A person with whom the child is placed in an out-of-home placement, including a resource family or an individual

designated by a county agency or private agency. The resource family is the caregiver for any child placed with them.

"County agency."  The county children and youth social service agency established in accordance with section 405 of the act of June 24, 1937 (P.L.2017, No.396), known as the County Institution District Law, or its successor, and supervised by the department under Article IX of the act of June 13, 1967 (P.L.31, No.21), known as the Public Welfare Code.

"Department."  The Department of Human Services of the Commonwealth.

"Out-of-home placement."  A setting that provides 24-hour substitute care for a child away from the child's parents or guardians and for whom the county agency has placement care and responsibility. The term includes resource family homes and supervised settings in which a child is living and, for a child who has attained 18 years of age, a supervised setting in which the individual is living independently. The term does not include secure facilities, facilities operated primarily for the detention of children who have been adjudicated delinquent, accredited psychiatric residential treatment facilities or hospitals.

"Private agency."  An entity that provides out-of-home placement services to children under a contract with a county agency.

"Reasonable and prudent parent standard."  The standard, characterized by careful and sensible parental decisions that maintain the health, safety and best interests of a child while encouraging the emotional and developmental growth of the child, that a caregiver must use when determining whether to allow a child in an out-of-home placement under the responsibility of the county agency to participate in extracurricular, enrichment, cultural and social activities.

"Resource family."  As defined under section 3 of the act of November 22, 2005 (P.L.404, No.73), known as the Resource Family Care Act.

**Compiler's Note:**  The short title of the act of June 13, 1967 (P.L.31, No.21), known as the Public Welfare Code, referred to in the def. of "county agency," was amended by the act of December 28, 2015 (P.L.500, No.92). The amended short title is now the Human Services Code.

Section 4.   Access and standard.

(a)   Access to activities and experiences.--Subject to subsection (b), a child in an out-of-home placement is allowed and afforded an opportunity to engage in, to the greatest extent possible, age-appropriate or developmentally appropriate activities and experiences. A child with a disability or special needs in an out-of-home placement shall have the same access to age-appropriate or developmentally appropriate activities and experiences as the child's nondisabled peers, even if reasonable accommodations are required.

(b)   Caregiver authority.--Caregivers have the authority to provide or withhold permission for children in their care to participate in and experience age-appropriate or developmentally appropriate activities and experiences in accordance with this section. The authority of a caregiver:

(1)   Must be exercised using the reasonable and prudent parent standard and does not conflict with any applicable court order or service plan.

(2)   May be exercised without the prior approval of a county agency or private agency or the court.

(c)   Reasonable and prudent parent standard.--When using the reasonable and prudent parent standard:

(1)   A caregiver must consider all of the following:

(i)   The child's age, maturity and developmental level to maintain the overall health and safety of the child.

      (ii)   The potential risk factors to the child or to others and the appropriateness of the extracurricular, enrichment, cultural or social activity or experience.

      (iii)   The best interest of the child, based on information known by the caregiver.

      (iv)   The importance of encouraging the child's emotional and developmental growth.

      (v)   The importance of supporting the child in developing skills to successfully transition to adulthood.

      (vi)   The importance of providing the child with the most family-like living experience possible.

      (vii)   Any special needs or accommodations that the child may need to safely participate in the activity or experience.

  (2)   The child's wishes, though not determinative, may also be considered.

  (d)   Limitation of liability.--A caregiver, county agency and private agency shall not be liable for harm caused to a child while engaged in an activity or experience approved by the caregiver if:

    (1)   the caregiver has completed the required training relating to the reasonable and prudent parent standard;

    (2)   the caregiver has made a good faith effort to use the reasonable and prudent parent standard in approving the activity or experience; and

    (3)   the approval does not conflict with any applicable court order or service plan.

  (e)   Other liability protection.--This section shall not remove or limit any existing liability protection afforded by any other law.

Section 5.   Obligations of department.

  The Office of Children, Youth and Families of the department shall do all of the following:

    (1)   Require, as a condition of licensure for county and private foster family care agencies and facilities providing out-of-home placements, the development of standards and training relating to the reasonable and prudent parent standard. The standards and training shall include, but are not limited to, the following:

      (i)   knowledge and skills relating to the developmental stages of the cognitive, emotional, physical and behavioral capacities of a child; and

      (ii)   knowledge and skills relating to applying the reasonable and prudent parent standard to:

        (A)   decisions such as whether to allow a child to engage in extracurricular, enrichment, cultural and social activities, including sports, field trips and overnight activities lasting one or more days;

        (B)   decisions involving the signing of permission slips and arranging transportation for the child to and from extracurricular, enrichment, cultural and social activities; and

        (C)   methods for appropriately considering the concerns of the biological parents of a child in decisions related to participation of the child in activities, with the understanding that those concerns should not necessarily determine the participation of the child in any activity.

    (2)   Verify, at yearly licensure reviews, that county and private agencies providing out-of-home placement do all of the following:

      (i)   Promote and protect the ability of a child to participate in age-appropriate or developmentally appropriate activities and experiences.

      (ii)   Implement policies consistent with this act.

(iii)   Provide and document that the required training under paragraph (1) has been provided to caregivers.

(3)   Develop standards and a process by which individuals employed by facilities providing out-of-home placements are designated to make decisions for children based on the reasonable and prudent parent standard.

(4)   Develop a template for the required training related to the reasonable and prudent parent standard in accordance with this act.

(5)   Work with interested parties, including children, to develop age-appropriate written materials that explain the requirements under this act.

Section 6.   County obligations.

A county agency shall do all of the following:

(1)   Ensure that all county-operated out-of-home placement settings other than a resource family home designate an individual to provide decision-making authority under the reasonable and prudent parent standard for children residing in their care. The individual designated should consult with county agency caseworkers or staff members who are most familiar with the child in applying and using the reasonable and prudent parent standard.

(2)   Ensure that contracts for purchased services between the county and a private agency that operates an out-of-home placement setting other than a resource family home include a requirement for the agency to designate an individual to provide decision-making authority under the reasonable and prudent parent standard for children residing in their care in accordance with staffing and supervision requirements applicable to the setting. The individual designated should consult with county agency and private agency caseworkers or staff members who are most familiar with the child in applying and using the reasonable and prudent parent standard.

(3)   Ensure that contracts for purchased services between the county and a private agency include a requirement for the private agency to provide training and monitoring of resource families regarding the application and use of the reasonable and prudent parent standard.

(4)   Provide training and monitoring of county agency resource families regarding the application and use of the reasonable and prudent parent standard.

(5)   Consistent with its case and placement planning responsibilities under Federal and State law, ensure that the child's service plan provides the opportunity to participate in age-appropriate or developmentally appropriate activities and experiences to the greatest extent possible to promote healthy child and adolescent development. A child's service plan shall include goals and objectives, and the child's progress toward meeting the goals and objectives, for the following:

(i)   Participation in extracurricular, enrichment, cultural and social activities.

(ii)   For a child who is 14 years of age or older, providing opportunities to gain experience in mastering skills needed to transition to adulthood and managing freedom and responsibility.

Section 7.   Notifications.

(a)   Caregiver.--The appropriate county agency shall ensure that a caregiver is provided with a written notification of the caregiver's responsibilities and rights under this act. The notification shall be provided at the time of a resource family home certification or the designation of a caregiver by a county agency or private agency and annually thereafter.

(b)   Child.--The county agency shall ensure that children in out-of-home placement have their opportunities under this act explained to them in a manner appropriate to the child's age,

development and maturity and that the children are provided with a written explanation of the requirements of this act at initial placement, for any subsequent move, and at least annually as part of the family service and permanency planning process. Consistent with the act of November 23, 2010 (P.L.1264, No.119), known as the Children in Foster Care Act, the requirements of this subsection shall be included in the list of requirements under section 3 of the Children in Foster Care Act, along with the explanation of the grievance policy. A notation that these notifications have been completed must be made in the child's record.

Section 8.   Training.

The reasonable and prudent parent standard training required under this act must be completed as follows:

(1)   A current caregiver must complete the training by December 31, 2015.

(2)   An individual who becomes a caregiver after the effective date of this section must complete the training prior to a child's placement, unless there is an emergency placement.

(3)   If a child is placed in an emergency placement after the effective date of this section, the caregiver shall complete the training within 60 days of the emergency placement.

Section 9.   This act shall take effect immediately.



*Ex/E*

M Gmail   Tamiera Harris <tamiera.harris@gmail.com>

**Meeting Agenda 5-25-17 with NET and DHS to review remaining expectations regarding Tamia Harris**
5 messages

**Dr. Tamiera Harris** <tamiera.harris@gmail.com>                     Thu, May 25, 2017 at 10:17 PM
To: Christina Johnson <Christina.Johnson@net-centers.org>, Ann Myers <Ann.Myers@net-centers.org>, Shaneal Singleton <Shaneal.Singleton@phila.gov>, Charise Gale <Charise.Gale@net-centers.org>, Tiffany Byrd <Tiffany.Byrd@net-centers.org>

Cc: Cynthia.Figueroa@phila.gov, "Smith, Carolyn" <csmith@pahouse.net>

Hi All,

I am summarizing my notes following the meeting today regarding the return of Tamia Harris. I have two questions and please confirm if I missed any details.

1. Monthly visits there will be two per month.

One visit will be scheduled with Tiffany Byrd (Profile writer and finalization worker) and one visit per month with **someone** from NET. Per the



meeting this visit from NET is to be unplanned but expected to be around my schedule. **Please confirm who the designated NET person is so I can add them to my contacts?**

**My tentative work schedule is 8:30 am to 6:00 pm**

2. In regards to respite I understand that my sister Tyeffa Harris has completed all training and background checks but still needs her home certified and this will be scheduled by NET if needed. However please note she will only care for Tamia at my certified home 9534 Clark Street if I ever need her assistance. Please contact her directly if a home certification is still needed.

3. It was confirmed that I can travel with Tamia and do not need approval from NET or DHS. However, I was asked to send an itinerary to the team. I have submitted my tentative summer vacation travel schedule in a separate email.

4. Expectations regarding adoption. It was confirmed that the family profile needs to be updated and child profiled needs to be certified. **Tiffany** please schedule a meeting to come out to my home to finish this process. We should complete the remaining steps prior to the next court date. My schedule is open and flexible. I will also forward updates from the last finalized family profile from January 2017 directly to you.

5. **It was confirmed that Tamia was originally removed from my home due to my provisional license allegedly had expired. I was surprised to this statement as I had already completed all recertification training prior to the February 3, 2017 court date when she was removed and I have a confirmation email from Second Chance that I was recertified and there were no additional training remaining. As you can imagine I am still completely shocked by this confirmation regarding her removal.**

5. Per meeting today, although NET and DHS agrees for Tamia Harris to be returned to me it was stated that she cannot be returned since the Child advocate Andre Martino has not confirmed agreement and did not attend the meeting or respond to inquiries. I stated that Judge Irvine already ordered that Tamia Harris is to be returned to me once I completed all requirements and NET and DHS agreed to her return **prior to the court date.** Per screenshot below from a letter from you this was also what we all agreed to in the previous meeting on 3-31-17. I have took time off of work to meet the demanding training schedule timely and expected DHS to uphold this agreement provided to me verbally and in writing. This time off was taken despite the fact that I was already recertified by Second Chance just a few months ago before the court date when she was removed.

**Shaneal if the child advocate agreement is hindering Tamia's return please request that he review the progress we have made including**

 Ex. E

the fact that I have completed all requirements from your letter dated March 27, 2017, the fact that both NET and DHS have already agreed for Tamia to be returned to me and provide his determination within 1 business day or provide his reason for delaying her return and disregarding Judge Irvine's order?

It is quite burdensome and costly to have to take time off from work to go to supervised visits twice a week when she can be home with me instead. It was also costly today to travel downtown to a meeting where I was expecting Tamia to be returned just to tell me the plan for monthly visits, travel expectations and final adoption steps especially since I completed 20 months of visits previously with NET and Second Chance and already been through the family profile process. Then I had to drive back up to the NET agency for a visit today and have to drive back to NET on Friday for another visit. Also Tamia's tries to leave with me every visit so this is a traumatic experience for her to keep up with this separation. If we are operating with the best interests of the child then it seems that reunification should occur now. Please follow up with the attorney and provide a response to me in a timely manner. I am exhausted and want you all to uphold the agreement we made and to abide by Judge Irvine's order.

Thank you,

Dr. Tamiera Harris

267-304-8787

Christina Johnson <Christina.Johnson@net-centers.org>                    Fri, May 26, 2017 at 12:52 PM

To: "Dr. Tamiera Harris" <tamiera.harris@gmail.com>, Ann Myers <Ann.Myers@net-centers.org>, Shaneal Singleton <Shaneal.Singleton@phila.gov>, Charise Gale <Charise.Gale@net-centers.org>, Tiffany Byrd <Tiffany.Byrd@net-centers.org>

Hello Dr. Harris,

Please be advised that your provider location code was received yesterday. I will be putting your certificate of approval in the mail today.

Thank you.



**Christina Johnson, M.S.**

**Director of Placement Services**

**2701 N. Broad Street, 1st Floor**

**Philadelphia, PA 19132**
**Office: (267) 479-6915**
**Cell:** (267) 253-1387

**Fax:** (215) 425-5025
**Email:** Christina.Johnson@net-centers.org

**NET FC On-Call:** 1-866-865-1553

**Intake phone and email** *(for referrals only)*
(267) 980-7654 fc.referral@net-centers.org

**Confidentiality Statement**

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. Please notify the sender immediately if you have received this e-mail by mistake, and delete this e-mail from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.



**Notice effective 11-01-2017**

Please note when you enter my residence you agree to being videotaped/recorded including all interactions may be videotaped/recorded via phone or camera for transparency and accountability purposes. If I am asked to sign a document and you are not providing a copy please note I will videotape the exchange and your audio may be included in the video. If you do not agree, you have the right not to enter my home.

-712 Waterview Lane

*Ex 6*

```
STATEMENT OF:          Tamiera Harris B/F
                       712 Waterview Lane
                       Phila., Pa. 19154

DOB:                   4-06-84

OCCUPATION:            Senior Clinical Project Mgr.

DATE AND TIME:         1-31-18  12:48 PM

PLACE:                 Philadelphia Police Department
                       Internal Affairs Division
                       7790 Dungan Road

CONCERNING:            I.A.D. Investigation #18-005

IN PRESENCE OF:

QUESTIONED BY:         Lt. Peter Sandusky #389

RECORDED BY:           Lt. Peter Sandusky #389
```

Tamiera Harris was advised that she is not in custody and is free to stop the interview and leave at any time.

Q. Ms. Harris, I am questioning you concerning an incident that occurred on 12-22-17, at 712 Waterview Lane, at approximately 2:20 PM. Please tell me everything you know concerning this incident.

A. Earlier that day I was scheduled to meet with social workers from NET and DHS. I had already met other social workers two weeks earlier for a safety check. Still, these workers came out after I sent them an email earlier that day asking them to copy my adoption lawyer since we were a few weeks out from finalizing an adoption. Prior to that visit I had filed grievances with NET and DHS about their documentation practices, where they said no safety checks had been done, when actually 19 months of safety checks had been done. This caused the child I had raised since birth to be removed from my custody because of their error. They acknowledged the error and the child was returned to me and I was awarded physical custody to keep them from coming and taking the child. We were scheduled to adopt on 1-18-18.

On 12-22-17, they came to my house and said they were sorry but upper management made the decision to remove the child from my custody a few days ago. I told them they would have to get a court order or a warrant but they are not taking the child. At that point they called the police on me. I asked them to leave and they stood in my doorway with the door open. The police arrived and one of the workers went outside and spoke to the police. I do not know the specifics of the conversation but one officer said to send over the court order to my district. The male and

*2 12*

female officers then came to my doorway and said they wanted to check on the child to make sure she was alright. The female asked my daughter if she was alright and she said yes. The female officer then walked around the apartment and checked the refrigerator to see if there was food and there was. Both the female and male officer asked the social workers to send over a court order and asked why the child was being removed. The social workers said upper management made the decision a couple of days earlier that the child was no longer safe and they wanted to remove the child because of concerns about my living arrangements. I informed the officers I sold my house months earlier and showed them a copy of my lease and the court order that showed the child was safe and should remain with me, her pre adoptive parent. At that point the female officer and male officer read the court order to the social workers that said I was to keep the child, and asked where was the order that said the child should be removed and signed by a judge. The workers replied there was no court order, that this was a decision made by management a few days earlier. I showed the officers my physical custody order decree and also showed them a family approval document which was authored by Net that I was approved to adopt a child, and we had completed all the steps to finish the adoption.

The DHS worker asked to speak to the officers privately while they had someone from DHS upper management on the phone. I did not hear that conversation. Once the conversation stopped the female officer approached me and my daughter was next to me and the officer took my daughter from me. The police officer told me to come to the side and took out his baton and said they just needed to talk to me and for me to come to the side. I told them they did not have a court order and a warrant to take her and they were not taking my child. The male officer told me we don't want this to get out of hand as he took out his baton. I immediately sat down. My daughter was frightened and I wanted to alleviate the stressful situation. The female officer passed my daughter to the social worker while another worker was still on the phone. They told him I still felt I had custody of the child, and did not want her removed and the police wanted a court order, and they did not have one. They said they were still going to remove the child. The female officer told the social workers they got what they wanted so let's go. They then walked out of my apartment.

DHS never logged the removal and for two weeks I did not know where the child was at. After two weeks I had the police go to NET and see why the child was removed. They told the police that adoption training was not completed. I showed the police that the adoption training was completed since April 2017. In order for me to get the child back I had to hire a lawyer and get a court hearing on why they removed the child from a pre adoptive mom, and that hearing is scheduled.

Q. What is your complaint against the police, and which officer are you making the complaint against?

A. I do not know the officers names but the male and female both entered my property and searched around without a warrant or a court order. The

EX G

female is on video walking around my apartment and looking in my refrigerator and she took my child and passed her to the social workers and allowed them to walk out of the house with her. The male officer was overly aggressive. He had his hand on his gun in the video. He appeared jittery and kept placing his hand on his gun when there was no need for aggressive action. I was calm. My main thing is I showed them my court order and paperwork and since the social workers did not show any paperwork, the officers should not have allowed the removal to occur.

Q. In your complaint you stated the Police should not have allowed DHS to take the child from your care, and failed to follow standard procedures. What procedures did the Police fail to follow?

A. They did not get a warrant to enter my home and search my home. They did not have probable cause to remove the child from my home. They by allowing the removal to occur denied me my due process as the pre adoptive mother of the child. The child has been out of my care for over 30 days and I have been emotionally suffering from the loss of the child due to their negligence.

Q. What was the relationship between you and the minor child, Tamia Harris?

A. I am her pre adoptive mother and maternal cousin.

Q. Did the male officer ever take his gun out of his holster and threaten you with it?

A. No.

Q. Did the male or female officers ever make any threats to you?

A. The male officer asked me to step aside and took his baton out and said he did not want it to escalate. I sat down once he did that.

Q. Did the officer strike you with his baton?

A. No.

Ex 6

Q. Is there anything you would like to add to this interview?

A. No.

STATEMENT CONCLUDED: 1:19 PM

I HAVE READ THE FOREGOING STATEMENT CONSISTING OF (4) PAGES
AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

SIGNATURE: _____

DATE: 1-31-2018   TIME: 1:26

WITNESSES: _____

_____

_____

Ex H

October 17, 2019

## Re: NOTIFICATION OF PENDING LITIGATION

Dear City of Philadelphia, Philadelphia Police Department, Net Community Care, Commissioner Cynthia Figueroa, Ms. Miriam Colon, Mr. Kenneth Dixon, Ms. Charise Gale, Ms. Tiffany Vann, Ms. Caterina Gallelli, Officer Sharon Conaway, Officer Craig Martella and DOES 1-50:

**I intend to file a claim against you all in Federal Court for the sum of $12,127,002.** A copy of which is enclosed to each of you which include very serious allegations by Plaintiffs Tamiera Harris and T.H including evidence on record with Philadelphia Family Court CP-51-DP-0002109-2015. The Defendants may have violated and/or be responsible for the following: Federal Civil Rights 42 U.S.C. § 1983 (Unwarranted Seizure and Judicial Deception), Monell-Related Claims, Violation of State Civil Rights, Intentional Infliction of Emotional Distress, Negligence and Negligent Infliction of Emotional Distress, False Imprisonment, Assault, Battery, Abuse of Process, Invasion of Privacy and Declaratory Relief.

As a direct and proximate result of all Defendants' misconduct and lack of oversight, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things. Miriam Colon, Kenneth Dixon, Charise Gale, Tiffany Vann and Caterina Gallelli fabricated a safety complaint that they were aware did not exist fueled by an evil motive amounting to malice after I filed grievances against them for performance issues and delays with the adoption. The Social Worker Defendants testified under oath and penalty of perjury on March 22, 2018 that there was no car seat inside the home, no baby food for a 2.5 year old and no permission to take a holiday vacation. Instead of properly investigating the complaint or informing me of the allegation at the time of seizure, the Social worker and Police Defendants Sharon Conaway and Craig Martella seized my Pre Adoptive child T.H. on December 22, 2017 without a warrant, judicial court order or exigent circumstance that T.H. was in danger of abuse or neglect in her preadoptive home and subsequently prolonged her detention for almost 2 years.

The child T.H. was happy, healthy and growing up in a loving, financially stable Christian home with her maternal cousin and Pre Adoptive Parent where all her needs were met with over 60 routine safety visits on record between DHS and CUA. This child was just 1 month away from finalization of her adoption prior to this unwarranted seizure. Instead the child T.H. was seized, her family was never contacted for placement and she was placed in a total of 4 non family foster care homes within 1 year where she was moved around and abused in 3 of them. All parties have been on notice for almost 2 years that the allegations against Dr. Tamiera Harris were not only false but each one including DHS legal team member Michael Mon, Esq and Commissioner Cynthia Figueroa also received picture and video evidence via email and first class mail which confirmed these allegations were fabricated.

DHS sent a reunification worker to my home on September 13, 2019 who confirmed my home was safe and perfect for the child T.H. which was audio and video recorded yet DHS and the Social Worker Defendants came to court on September 24, 2019 and wanted to continue to

Ex H

detain the child T.H. All parties in this foreseeable lawsuit have failed to show any accountability for these violations mentioned above and have shown deliberate indifference to our Constitutional Rights. Case CP-51-DP-0002109-2015 has been remanded by the Superior court of Pennsylvania twice and a Judge has recused himself after being Judicially deceived by DHS and its agents. The removal statute, 28 U.S.C. § 1447(c), contains a fee-shifting provision which states, in pertinent part, that any "order remanding [a] case may require payment of just costs and any actual expenses, including attorney fees, incurred because of the removal.

Prior to filing a suit in federal court, it is my desire to attempt a good faith resolution of this matter. The City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542, Title 42 § 8550 and other applicable statutory and case law. **I seek a response within 21 days to attempt to resolve this matter and for mediation relating to all expenses, attorney fees, damages and losses we have incurred and will continue to incur.** If this is your desire as well, please contact me in writing via certified mail and email no later than November 8, 2019.

*A Santa Ana appellate court affirmed a nearly $10.6 million legal judgment delivered in 2007 against Orange County's Department of Social Services for wrongfully depriving a Seal Beach woman of her children after two social workers fabricated negative evidence against her and suppressed positive evidence to support their decision to recommend that her daughters, who were then 6 and 9, be taken from her care and control and they were placed in foster care. DHS provided inadequate training and/or supervision to the social workers and showed a deliberate indifference. Orange County v. Fogarty-Hardwick*

The matters set forth are intended for settlement purposes only and are strictly confidential. This notice is not a formal court Claim and there is no legal obligation to respond or to take any action. However, it provides an opportunity for us to voluntarily negotiate a resolution. This may save you costs, time and court appearances. If we are not able to reach a resolution within 21 days of receipt of this Notice, I may file a formal Claim against you in Federal Court within 1 week of expiration of this notice. If I receive no response or if we cannot come up with a respectful and reasonable agreement, I expressly reserve the right to pursue all legal remedies available to me whether I decide to institute formal litigation procedures against you or any other legal claims.

Sincerely,

Dr. Tamiera Harris

Address:
4821 Unruh Avenue
Philadelphia, PA 19135
Email:
tamierasharris@gmail.com
Phone:
215-987-6860

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161206

Your item was delivered to an individual at the address at 1:42 pm on October 28, 2019 in PHILADELPHIA, PA 19140.

✅ **Delivered**

October 28, 2019 at 1:42 pm
Delivered, Left with Individual
PHILADELPHIA, PA 19140

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161213

Your item was delivered to the front desk, reception area, or mail room at 2:07 pm on October 24, 2019 in PHILADELPHIA, PA 19123.

✅ **Delivered**

October 24, 2019 at 2:07 pm
Delivered, Front Desk/Reception/Mail Room
PHILADELPHIA, PA 19123

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161220

Your item was delivered to an individual at the address at 12:34 pm on October 24, 2019 in PHILADELPHIA, PA 19140.

✅ **Delivered**

October 24, 2019 at 12:34 pm
Delivered, Left with Individual
PHILADELPHIA, PA 19140

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161275

Your item was delivered to an individual at the address at 10:33 am on October 21, 2019 in PHILADELPHIA, PA 19114.

✅ **Delivered**

October 21, 2019 at 10:33 am
Delivered, Left with Individual
PHILADELPHIA, PA 19114

Get Updates ⌄

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161268

Your item was delivered to the front desk, reception area, or mail room at 2:16 pm on October 22, 2019 in PHILADELPHIA, PA 19102.

✅ **Delivered**

October 22, 2019 at 2:16 pm

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161237

Your item was delivered to an individual at the address at 12:34 pm on October 24, 2019 in PHILADELPHIA, PA 19140.

✅ **Delivered**

October 24, 2019 at 12:34 pm
Delivered, Left with Individual
PHILADELPHIA, PA 19140

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161244

Your item was delivered to an individual at the address at 10:33 am on October 21, 2019 in PHILADELPHIA, PA 19114.

✅ **Delivered**

October 21, 2019 at 10:33 am
Delivered, Left with Individual
PHILADELPHIA, PA 19114

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161190

Your item was delivered to the front desk, reception area, or mailroom at 4:08 pm on October 21, 2019 in PHILADELPHIA, PA 19102.

✅ **Delivered**

October 21, 2019 at 4:08 pm
Delivered, Front Desk/Reception/Mail Room
PHILADELPHIA, PA 19102

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161176

Your item was delivered to an individual at the address at 12:31 pm on October 24, 2019 in PHILADELPHIA, PA 19140.

✅ **Delivered**

October 24, 2019 at 12:31 pm
Delivered, Left with Individual

---

USPS Tracking®    FAQs >

Track Another Package +

**Tracking Number:**    Remove ✕
70190700000031161251

Your item was delivered to the front desk, reception area, or mail room at 3:42 pm on October 21, 2019 in PHILADELPHIA, PA 19102.

✅ **Delivered**

October 21, 2019 at 3:42 pm
Delivered, Front Desk/Reception/Mail Room
PHILADELPHIA, PA 19102



E X H

November 18, 2019

## Re: FINAL NOTIFICATION OF PENDING LITIGATION

Dear City of Philadelphia, Philadelphia Police Department, Net Community Care, Commissioner Cynthia Figueroa, Ms. Miriam Colon, Mr. Kenneth Dixon, Ms. Charise Gale, Ms. Tiffany Vann, Ms. Caterina Gallelli, Officer Sharon Conaway, Officer Craig Martella and DOES 1-50:

      **I am filing a claim against you all in Federal Court for the sum of $12,127,002.** A copy of which has been sent to each of you which include very serious allegations by Plaintiffs Tamiera Harris and T.H including evidence on record with Philadelphia Family Court CP-51-DP-0002109-2015. The Defendants may have violated and/or be responsible for the following: Federal Civil Rights 42 U.S.C. § 1983 (Unwarranted Seizure and Judicial Deception), Monell-Related Claims, Violation of State Civil Rights, Intentional Infliction of Emotional Distress, Negligence and Negligent Infliction of Emotional Distress, False Imprisonment, Assault, Battery, Abuse of Process, Invasion of Privacy and Declaratory Relief.

      As a direct and proximate result of all Defendants' misconduct and lack of oversight, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things. Miriam Colon, Kenneth Dixon, Charise Gale, Tiffany Vann and Caterina Gallelli fabricated a safety complaint that they were aware did not exist fueled by an evil motive amounting to malice after I filed grievances against them for performance issues and delays with the adoption. The Social Worker Defendants testified under oath and penalty of perjury on March 22, 2018 that there was no car seat inside the home, no baby food for a 2.5 year old and no permission to take a holiday vacation. Instead of properly investigating the complaint or informing me of the allegation at the time of seizure, the Social worker and Police Defendants Sharon Conaway and Craig Martella seized my Pre Adoptive child T.H. on December 22, 2017 without a warrant, judicial court order or exigent circumstance that T.H. was in danger of abuse or neglect in her preadoptive home and subsequently prolonged her detention for almost 2 years.

      The child T.H. was happy, healthy and growing up in a loving, financially stable Christian home with her maternal cousin and Pre Adoptive Parent where all her needs were met with over 60 routine safety visits on record between DHS and CUA. This child was just 1 month away from finalization of her adoption prior to this unwarranted seizure. Instead the child T.H. was seized, her family was never contacted for placement and she was placed in a total of 4 non family foster care homes within 1 year where she was moved around and abused in 3 of them. All parties have been on notice for almost 2 years that the allegations against Dr. Tamiera Harris were not only false but each one including DHS legal team member Michael Mon, Esq and Commissioner Cynthia Figueroa also received picture and video evidence via email and first class mail which confirmed these allegations were fabricated.

      DHS sent a reunification worker to my home on September 13, 2019 who confirmed my home was safe and perfect for the child T.H. which was audio and video recorded yet DHS and the Social Worker Defendants came to court on September 24, 2019 and wanted to continue to

detain the child T.H. All parties in this foreseeable lawsuit have failed to show any accountability for these violations mentioned above and have shown deliberate indifference to our Constitutional Rights. Case CP-51-DP-0002109-2015 has been remanded by the Superior court of Pennsylvania twice and a Judge has recused himself after being Judicially deceived by DHS and its agents. The removal statute, 28 U.S.C. § 1447(c), contains a fee-shifting provision which states, in pertinent part, that any "order remanding [a] case may require payment of just costs and any actual expenses, including attorney fees, incurred because of the removal. The City of Philadelphia is vicariously responsible for the conduct of its social services agents, under Pennsylvania Code Title 42 § 8542, Title 42 § 8550 and other applicable statutory and case law.

Sincerely,

Dr. Tamiera Harris

Address:
4821 Unruh Avenue
Philadelphia, PA 19135
Email:
tamierasharris@gmail.com
Phone:
215-987-6860

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

19 5436

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Lamera Harris
T.H. A minor

## DEFENDANTS

City of Philadelphia, Phila
Police dept, Net community care, Cynthia
hyونnn, miriam colon kenneth Dixon, carole
awale, Cekrino Gollel, sheron conquest, crystal marant

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*   Pro se
4821 Unruh Ave
Phi.a. PA 19135

Attorneys *(If Known)*
City of Philadelphia
1515 Arch St, 17th FLR
Phila. PA 19102

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Civil rights 42 U.S.C 1983

Brief description of cause:
Unwarranted, unlawful seizure, due process, emotional distress

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  $12,127,002

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE  11-19-2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

19    5436

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 4821 Unruh Avenue Philadelphia PA 19135

Address of Defendant: 1515 Arch St 17th Floor, Phila PA 19102

Place of Accident, Incident or Transaction: 701 Waterview Lane, Philadelphia PA 19154

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐ No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐ No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐ No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐ No ☐

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 11-19-2019

_____    _____
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Tamiera Harris, counsel of record *or* pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: 11-19-2019

_____    _____
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

|  |  | CIVIL ACTION |
|---|---|---|
| v. | : | **19    5436** |
|  | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                            ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                       (✓)

(f) Standard Management – Cases that do not fall into any one of the other tracks.           ( )

11-19-2019                    _____
**Date**                              **Pro Se Plaintiff**

2159876860                    _____   tamieraharris@gmail.com

**Telephone**            **FAX Number**              **E-Mail Address**

(Civ. 660) 10/02